IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  10-20938- CIV KING/MCALILEY

NICOLAS ESTRELLA,
    Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
    Defendant.
_____/

## STATEMENT OF MATERIAL FACTS

1. At all relevant times, Plaintiff Nicolas Estrella (hereinafter "Estrella") was the owner of the 2000 85' Azimut Motor Yacht "Star One." (Complaint, D.E. 1, ¶ 7)

2. At all relevant times, the M/Y STAR ONE was insured under policy number 0037005799 issued by Defendant Federal Insurance Company to Estrella.  Estrella was the sole beneficiary of the policy number 0037005799, which provided coverage in the amount of $3,000,000 for loss of property. (Exhibit A to Complaint, D.E. 1)

3. On May 3, 2009, the M/Y STAR ONE was found in an inverted position, almost completely submerged, in the Tongue of the Ocean off Andros Island, Bahamas, by the crew of the M/Y ESOTERIC.  The depth of the water at the location where the M/Y STAR ONE was discovered is in excess of 6,000 feet. (Deposition of Phillip Davis, page 4 line 9 – page 5 line 7, page 21 lines 4-12)

4. When the M/Y STAR ONE was discovered in its submerged position, the hatches and doors of the vessel were wired open, the portlights and portholes of the vessel were broken or in an open position, hoses and pipes aboard the vessel were cut open, and the inflatable tenders of the vessel had been intentionally deflated.  (Deposition of William Casey, page 29 lines 12-14, page 30 lines 20-22, page 31 lines 11-24, page 32 lines 4-6, page 32 lines 13-21, page 35 lines 5-16, page 37 lines 7-19, page 41 lines 21-25; Deposition of Phillip Davis, page 8 lines 11-17, page 10 line 10 – page 11 line 7, page 11 lines 12-17, page 13 line 8 – page 14 line 24, page 27 line 15 – page 28 line 7; Deposition of David Mitchell, page 7 line 10, page 8 line 5 – page 9 line 3)

5. The lids to the sea chests of the M/Y STAR ONE had been intentionally removed to further allow entry of sea water into the vessel. (Deposition of David Mitchell, page 12 line 17 – page 13 line 14)

6. The engines of the M/Y STAR ONE were running when the vessel went down. (Declaration of Peter Angel)

7. The loss of the M/Y STAR ONE was the result of an unsuccessful attempt to intentionally sink her. (Deposition of William Casey, page 40 lines 7-9; Deposition of Phillip Davis, page 8 line 21 – page 9 line 2)

8. When the M/Y STAR ONE was discovered in its submerged position, the keys to the vessel were in the ignition and the throttle of the vessel was in full reverse. (Deposition of William Casey, page 36 lines 19-25)

9. When the M/Y STAR ONE was discovered in its submerged position, the GPS plotter had been removed from the flybridge of the vessel. (Deposition of William Casey, page 37 line 21 – page 38 line 5)

10. No people were found in the water in the vicinity of the submerged M/Y STAR ONE when it was discovered. (Deposition of Phillip Davis, page 6 lines 2-4)

11. There was no evidence of damage to the props, struts, rudders, or hull of the M/Y STAR ONE that would be consistent with grounding as a cause of the loss. (Deposition of William Casey, page 45 line 14-18)

12. There was a thought-out attempt to eliminate air pockets from the vessel and the condition of the vessel indicated that steps were taken to cause more water to enter the vessel quickly. (Deposition of William Casey, page 41 lines 3-7, page 42 lines 15-18)

13. The M/Y STAR ONE was purchased by Estrella for $2,483,575 on April 26, 2001, and had been continuously listed for sale since that time, more than eight (8) years prior to the loss of the vessel on May 3, 2009. (EUO of Nicolas Estrella, page 94 lines 10-16)

14. Estrella had lost interest in the M/Y STAR ONE and had not used the vessel since the summer of 2008. (EUO of Nicolas Estrella, page 36 line 14 – page 37 line 3; Deposition of James Matthysse page 40 lines 3-10)

15. Personal pleasure watercraft, including yachts such as the M/Y STAR ONE, depreciate in value over time. (Declaration of Jason Dunbar)

16. The listing price of the M/Y STAR ONE was approximately $2,700,000, which is in excess of the purchase price of the vessel and $300,000 less than the insured value of the vessel. (Deposition of Ralph Navarro, page 32 lines 7-10)

17. The listing broker of the vessel arranged for a survey of the vessel to be performed on March 13, 2009, approximately six (6) weeks prior to the loss of the vessel. (Deposition of Robert Garay, page 8 lines 2-9)

18. The surveyor who performed the March 13, 2009, survey, Robert Garay, identified seventy-two (72) deficiencies to be corrected or further examined on the M/Y STAR ONE at the time of his survey. (Deposition of Robert Garay, page 29 line 12 – page 30 line 2)

19. The estimated cost to repair the deficiencies identified on the Garay survey would be $134,882.26, including parts, labor, sales tax, and liability surcharge.  In addition, generator damage sustained after the Garay survey would have cost an additional $30,012.62 for repairs.  (Declaration of Matthew Schmahl)

20. None of the deficiencies identified by Robert Garay in his March 13, 2009, survey of the M/Y STAR ONE were ever corrected or rectified. (Deposition of Ralph Navarro page 43 lines 2-23)

21. Robert Garay, retained by the listing agent to assess the value of the M/Y STAR ONE, determined the "Fair Market Value" of the M/Y Star One to be $1,865,000. (Deposition of Robert Garay, page 27 lines 17-21)

22. A survey conducted by or on behalf of a listing agent of a vessel would have the potential for a biased, more favorable valuation. (Declaration of Jason Dunbar)

23. The actual "Fair Market Value" of the M/Y STAR ONE at the time of the loss, was $1,125,000 to $1,220,000. (Declaration of Jason Dunbar)

24. At the time of the sinking of the M/Y STAR ONE, Estrella was in financial distress personally as were the corporations owned and controlled by him. (Declaration of Neil Burell)

25. Estrella is the owner of Centrex Premium Finance Corp. (hereinafter "Centrex"), and controlled the finances of Centrex. (Deposition of Soneet Kapila, page 5 lines 9-13, page 22 lines 10-15, page 59 lines 11-15)

26. The business model of Centrex defied any logic except to serve the interests of its principal. (Deposition of Soneet Kapila, page 47 line 25 – page 48 line 4)

27. On January 26, 2007, Centrex obtained a revolving line of credit from Wachovia Bank, N.A. in the amount of $20,000,000. (Deposition of Ron Ferguson, page 13 lines 16-24)

28. Estrella personally guaranteed the Centrex revolving line of credit in the amount of $2,000,000. (Deposition of Ron Ferguson, page 16 lines 17-25; Deposition of Soneet Kapila, page 10 lines 5-12)

29. The Centrex revolving line of credit matured in full in June 2009. In April 2009, weeks before the loss of the M/Y STAR ONE, Wachovia Bank, N.A. notified Centrex and Estrella that the revolving line of credit would not be renewed. (Deposition of Ron Ferguson, page 25 line 19 – page 26 line 9)

30. On May 15, 2009, Wachovia Bank, N.A., notified Centrex and Estrella that the revolving line of credit was in default and that all obligations due from Centrex and Estrella were immediately due and payable on demand. (Deposition of Ron Ferguson, page 20 lines 18-25)

31. At the time of the notification of default, the total amount due under the revolving line of credit was $16,255,036.06. (Deposition of Ron Ferguson, page 21 line 25 – page 22 line 4)

32. Estrella was personally liable for a minimum of $2,000,000 plus accrued interest, fees, expenses, etc., due to his personal guaranty of the Centrex revolving line of credit. (Deposition of Ron Ferguson, page 22 line 17 – page 23 line 1)

33. Wachovia contends that Estrella was personally responsible for the full $16,255,036.06 due under the revolving line of credit as a result of fraud on Estrella's part. (Deposition of Ron Ferguson, page 44 lines 11-15)

34. Centrex was illiquid at the time of default as a result of fraudulent transfers from the company to Estrella for personal use and benefit. These transfers drained the assets of Centrex to the point that the company could not continue as a going business concern. (Deposition of Soneet Kapila, page 15 line 22 – page 16 line 14, page 67 lines 4-21)

35. In January 2009, Centrex transferred $2,500,000 to a title company in Texas on behalf of Estrella, personally, and had no business relation back to Centrex. (Deposition of Soneet Kapila, page 45 lines 17-24, page 46 lines 9-22)

36. From 2007 through 2009, Estrella took stockholder distributions in excess of $9,400,000 from Centrex. (Deposition of Soneet Kapila, page 69 line 10 – page 70 line11)

37. Estrella also maintained a Home Equity Line Of Credit ("HELOC") through Wachovia Bank, N.A. which was secured by a lien on his personal residence. The credit available to Estrella under this HELOC was $12,000,000. (Deposition of John Hogan, page 12 lines 10-13)

38. The HELOC was terminated based on new appraisals of the personal residence, which indicated a decrease of the value of the property such that the value of the property was less than the credit limit of the HELOC. Estrella also refused to provide Wachovia with Personal Financial Statements. (Deposition of John Hogan, page 10 line 15-page 11 line 10, page12 lines 4-6)

39. In April 2009, Estrella drained $5,000,000 from the HELOC, essentially taking the account to its maximum balance, including thirty-one (31) separate cash advances of $99,000 on April 22, 2009, less than two weeks before the scuttling of the M/Y STAR ONE. (Declaration of Neil Burell)

40. In 2009, despite the value of any assets which may have belonged to him, Estrella was illiquid. (Deposition of Soneet Kapila, page 48 line 20 – page 49 line 5; Declaration of Neil Burell)

41. Estrella's income was decreasing annually, from a taxable income of $4,483,588.00 in 2007, to income of $2,775,280.00 in 2008, to a loss of $317,887.00 in 2009. (Declaration of Neil Burell)

42. At the same time, losses from Estrella's agricultural holdings increased from $1,252,954 in 2007, to $2,205,278 in 2008, to $4,017,968 in 2009. (Declaration of Neil Burell)

43. From December 2008 through the summer of 2009, Estrella was liquidating assets, including real property, to increase cash flow. (Declaration of Neil Burell)

44. The M/Y STAR ONE was berthed at a private dock belonging to Estrella which was located across the street from Estrella's private residence. (Deposition of Shawn Catra, page 19 lines 9-11)

45. The private dock where the M/Y STAR ONE was berthed is a very secure location. (Deposition of Alejandro Moya, page 91 lines 4-7)

46. The channel from Estrella's private dock to open water is minimally marked and requires particularized knowledge of the area to transit. (Deposition of James Matthysse, page 78 line 5 – page 81 line 4)

47. The M/Y STAR ONE, prior to the loss, had a mechanical and/or electrical problem which prevented the starting of the vessel from the helm station or flybridge in a traditional manner. The use and operation of the vessel required particularized knowledge due to this mechanical and/or electrical problem. (Deposition of James Matthysse, page 52 line 20 – page 53 line 11; Deposition of Alejandro Moya, page 83 line 25 – page 85 line 3, page 89 line 23 – page 90 line 9; Deposition of Shawn Catra, page 13 line 11 – page 14 line 8)

48. The M/Y STAR ONE had a complicated system for transferring fuel from the main tank to the day tanks which required particularized knowledge to operate the vessel. (Deposition of James Matthysse, page 49 line 13 – page 50 line 4; Deposition of Shawn Catra, page 21 line 24 – page 22 line 14)

49. Without transferring fuel from the main tank to the day tank, the M/Y STAR ONE would not be able to cruise under her own power from the dock at Estrella's residence to the location in the Bahamas where the vessel was discovered on May 3, 2009. (Declaration of William Casey)

50. Figueredo was educated about the fuel transfer system of the M/Y STAR ONE during the repairs of the starboard generator in late April 2009. (Deposition of Alejandro Moya, page 52 line 20 – page 53 line 14)

51. Figueredo is a close personal friend of Estrella who has attended family birthday parties, weddings, and holiday celebrations at Estrella's residence, including dinners since the time of the loss of the M/Y STAR ONE. (Deposition of Alejandro Moya, page 17 line 20 – page 19 line 16; Deposition of Shawn Catra, page 24 lines 1-13, page 25 line 22 – page 26 line 11; Deposition of Robert Figueredo, page 94 line 23 – page 95 line 8, page 40 lines 5-19; Deposition of Ralph Navarro, page 9 line 25 – page 10 line 24)

52. Nicolas Estrella contributed $10,000 to Robert Figueredo's legal defense fund related to the ongoing criminal investigation of the scuttling of the M/Y STAR ONE. (Deposition of Nicolas Estrella taken July 28, 2011 – transcript will be filed upon receipt).

53. Figueredo was paid at least $13,865.16 from accounts belonging to Estrella's companies during 2009. (Declaration of Neil Burell)

54. On or about April 6 and April 7, 2009, less than one month prior to the loss of the M/Y STAR ONE, Figueredo and Eric MacKenzie operated the vessel on a voyage to Bimini, Bahamas. (Deposition of Eric MacKenzie, page 5 line 6 – page 6 line 2; Deposition of Robert Figueredo, page 13 lines 13-20)

55. Figueredo and MacKenzie were alone on the M/Y STAR ONE for the April 2009 trip to Bimini. (Deposition of Eric MacKenzie, page 8 lines 16-19)

56. During this voyage, both generators of the M/Y STAR ONE were damaged, the port generator caught fire, and the vessel required a tow back to Key Biscayne due to fuel starvation – the failure to transfer fuel from the main tank to the day tanks. (Deposition of Alejandro Moya, page 27 lines 13-22, page 49 line 19 – page 50 line 13; Deposition of Eric MacKenzie, page 5 line 6 – page 6 line 2)

57. The tow of the M/Y STAR ONE was performed by John Tellam, who charged $6,000 to $7,000 for his services. Tellam was paid by Figueredo. Lorene Bariso testified that Figueredo was cash poor at the time of this tow. (Deposition of John Tellam, page 14 line 14 – page 15 line 7; Deposition of Lorene Bariso, page 88 lines 14-17 )

58. Precision Generators was instructed to cannibalize the port generator to repair the other because the M/Y STAR ONE was "scheduled for a trip." (Deposition of Alejandro Moya, page 40 line 7 – page 41 line 11, page 45 lines 12-24)

59. The fire damaged port generator was never rebuilt or repaired. (EUO of Alejandro Moya, page 18 line 13 – page 19 line 2)

60. No insurance claim was ever made for any damage to the M/Y STAR ONE in April 2009. (Deposition of Cornelius Sullivan, page 19 lines 16-22)

61. The repairs to the generator of the M/Y STAR ONE were completed on or about April 29, 2009. (Deposition of Alejandro Moya, page 41 line 12 – page 43 line 20)

62. Between 5:30 and 6:00am on May 3, 2009, the morning of the day the M/Y STAR ONE was found capsized in the Bahamas, Lorene Bariso drove Figueredo and MacKenzie to Estrella's dock, where the vessel was berthed. (Deposition of Lorene Bariso, page 19 line 21 – page 20 line 14)

63. Figueredo and MacKenzie were picked up by Bariso at approximately 6:00pm on May 3, 2009, at Mashta Key. (Deposition of Lorene Bariso, page 23 lines 3-12)

64. When they were met by Bariso on May 3, 2009, Figueredo and MacKenzie had in their possession statues which had been on board the M/Y STAR ONE. (Deposition of Lorene Bariso, page 25 line 24 – page 26 line 24)

65. In the days following May 3, 2009, Figueredo told Lorene Bariso, that he and Eric MacKenzie had sunk the M/Y STAR ONE on May 3, 2009. (Deposition of Lorene Bariso, page 9 line 25 – page 10 line 6, page 18 lines 11-19)

66. Figueredo told Bariso the sinking of the M/Y STAR ONE was done so that an insurance claim could be made on the vessel. (Deposition of Lorene Bariso, page 18 line 20 – page 19 line 3)

67. Figueredo told Bariso that he had scuttled the M/Y STAR ONE because he had been paid to do so. (Deposition of Lorene Bariso, page 19 lines 9-13)

68. Figueredo told Bariso that he was going to receive approximately $100,000 for sinking the M/Y STAR ONE. (Deposition of Lorene Bariso, page 19 lines 9-13)

69. Bariso contacted law enforcement contemporaneously with Figueredo's admission and was interviewed by Miami-Dade Police Department Economic Crimes Unit Detective Christian Winch. (Deposition of Lorene Bariso, page 36 line 14 – page 37 line 17)

70. The Florida Department of Insurance Fraud is actively investigating the loss of the M/Y STAR ONE and the resultant insurance claim. (Deposition of Det. Christian Winch, page 6 lines 20-23)

71. Bariso was contacted in January 2011 by Figueredo. Figueredo tried to convince her to change her story and retract the information she had provided to police. (Deposition of Lorene Bariso, page 30 line 5 – page 32 line 7)

72. Figueredo told Bariso that he wanted her to change her story because he was in big trouble and was looking at going to prison. (Deposition of Lorene Bariso, page 31 line 23 through page 32 line 2)

73. Figueredo had no independent motive to sink the M/Y STAR ONE (EUO of Nicolas Estrella, page 78 lines 3-14)

74. Estrella cannot identify any person with a motive to sink the M/Y STAR ONE. (EUO of Nicolas Estrella, page 157 line 15 – page 158 line 2)

75. No one other than Estrella had a motive to sink the M/Y STAR ONE. (Declaration of Todd Schwede)

76. Neither Estrella nor any other individual contacted or interviewed during the course of the investigation into this loss has identified any other party or entity who would have had a motive to scuttle the M/Y STAR ONE. (Deposition of Cornelius Sullivan, page 171 lines 8-12, page 176 line 7 – page 178 line 14)

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 29th day of July, 2011 this document was electronically filed with Clerk of the Court using CM/ECF. I also certify that on this day, the foregoing document is being served on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Respectfully Submitted,

s/ *Seth E. Harris*

CHRISTOPHER R. FERTIG (218421)
chris.fertig@fertig.com
SETH E. HARRIS (076217)
seh@fertig.com

Fertig & Gramling
200 Southeast 13th Street
Fort Lauderdale, FL 33316
Telephone:   954-763-5020
Facsimile:   954-763-5412
Attorneys for Federal Insurance Company

**SERVICE LIST**

Christopher R. Fertig (Florida Bar #218421)
Seth E. Harris (florida Bar #076217)
Fertig & Gramling
200 Southeast 13th Street
Fort Lauderdale, FL 33316
Telephone:   954-763-5020
Facsimile:   954-763-5412
chris.fertig@fertig.com
seh@fertig.com
Attorneys for Federal Insurance Company

Michael R. Karcher (Florida Bar #516287
Karcher, Canning & Karcher
888 SE Third Avenue - #300
Fort Lauderdale, FL  33316
Telephone:  954-356-6999
Facsimile:    954-356-6889
mrk@ukandk.com
Attorneys for Nicolas Estrella