Case 1:10-cv-20938-JLK Document 198-1 Entered on FLSD Docket 06/14/2011 Page 1 of 21
Case 1:10-cv-20938-JLK Document 125-1 Entered on FLSD Docket 04/20/2011 Page 1 of 21

1 (Pages 1 to 4)

## Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-CV-20938-JLK

NICOLAS ESTRELLA,
        Plaintiff,
    vs.
FEDERAL INSURANCE COMPANY
        Defendant.
_____/

DEPOSITION OF
DETECTIVE CHRISTIAN WINCH

Taken on Behalf of the Defendant

DATE TAKEN: April 13, 2011
TIME:       9:50 a.m.
PLACE:      9105 N.W. 25th Street
            Doral, Florida

Examination of the witness taken before:
            Nancy S. Johnson
            United Reporting, Inc.
            1218 S.E. 3rd Avenue
            Fort Lauderdale, Florida, 33316

## Page 2

1  APPEARANCE:
2  KARCHER, CANNING & KARCHER
   By:  MICHAEL R. KARCHER, ESQ.,
3  appearing on behalf of the Plaintiff.
4  FERTIG & GRAMLING,
   By:  CHRISTOPHER R. FERTIG, ESQ.,
5  appearing on behalf of the Defendant.
6
7           I N D E X
8
9  WITNESS                          PAGE
10 Detective Winch
11 Direct Examination by Mr. Fertig      3
   Cross-Examination by Mr. Karcher     18
12 Redirect Examination by Mr. Fertig   45
   Recross Examination by Mr. Karcher   47
13 Further Redirect Examination by Mr. Fertig   49
   Further Recross Examination by Mr. Karcher   49
14
15
16           EXHIBITS
17         (No Exhibits Marked)
18
19
20
21
22
23
24
25

## Page 3

1       Deposition of DETECTIVE CHRISTIAN WINCH,
2  the Deponent herein, taken on behalf of the
3  Defendant herein, for the purpose of discovery and
4  for use as evidence in the above-entitled cause,
5  pending in the United States District Court,
6  Southern District of Florida, before Nancy S.
7  Johnson, Notary Public in and for the State of
8  Florida at Large pursuant to notice heretofore
9  filed, at 9105 N.W. 25th Street, City of Doral,
10 Florida, on the 13th day of April 2011, commencing
11 at 9:50 a.m.
12 THEREUPON:
13       DETECTIVE CHRISTIAN WINCH
14 the Deponent herein, being of lawful age and being
15 first duly sworn in the above-entitled cause,
16 testified on his oath as follows:
17       DIRECT EXAMINATION
18 BY MR. FERTIG:
19    Q   Please state your name, sir.
20    A   Christian George Winch.
21    Q   What do you do for a living?
22    A   I'm a detective for the Miami-Dade Police
23 Department.
24    Q   What department within the police
25 department are you associated with?

## Page 4

1    A   I work for the Economic Crime Bureau in a
2  specialized unit called the Auto Task Force.
3    Q   And, just generally, what is the
4  specialty of the Miami-Dade Police Department's
5  Economic Crime Unit?
6    A   We deal mainly with cars. I specialize
7  in boats, motorcycles -- vehicles in total regarding
8  thefts, organized crime, fraud, title fraud, bank
9  fraud. All the above.
10   Q   How long have you been in law
11 enforcement?
12   A   I'm going on 16 years.
13   Q   You mentioned that you were also involved
14 with boats. Do you have any particular training or
15 specialization with respect to boats?
16   A   Yes. I've been doing vessels,
17 specializing in vessels for about seven years now. I
18 went ahead and obtained a certified marine
19 investigator title through an organization, a
20 world-wide organization called IAMI, International
21 Association of Marine Investigators, which they're
22 worldwide.
23   Q   We're here today regarding a vessel by
24 the name of Star One, an 85 foot Azimut, that was
25 owned by Nicholas Estrella.

Case 1:10-cv-20933-KMM Document 198-1 Entered on FLSD Docket 06/14/2011 Page 2 of 21
Case 1:10-cv-20933-JLK Document 125-1 Entered on FLSD Docket 04/20/2011 Page 2 of 21

2 (Pages 5 to 8)

---

Page 5

1          In the course of your professional
2  activities as a detective with the Economic Crime
3  Unit, did you ever develop any information with
4  respect to that vessel?
5      A   Yes.
6      Q   When did you first become aware of a
7  incident with the Star One?
8      A   I believe it was around June of 2009, if
9  I'm not mistaken.
10     Q   What did you learn at that time?
11     A   That I received information regarding a
12 possible fraud on a theft of the vessel in question.
13     Q   Okay.  Were you aware of what happened to
14 the vessel?
15     A   After I initiated my initial
16 investigation, obtained reports, so on and so forth,
17 then I became aware.
18     Q   And what did you learn from that
19 investigation?
20     A   The vessel was reported out of the City
21 of Key Biscayne around about the date between the 28th
22 of April and I think the 1st of May.  And with the
23 information that I obtained, you know, I went ahead
24 and spend an initial investigation on this case to
25 get more details if there's any criminal intent or

---

Page 6

1  activity on this case.
2      Q   Well, at the initial stages of
3  investigation, were you aware of what physically
4  happened to the boat, where it was, what happened?
5      A   I later found out that the vessel was
6  scuttled -- well, at least attempted to be sunk -- in
7  the Bahamas in the area of Chub Cay or something like
8  that.
9      Q   Right.  How did you first become aware of
10 this whole issue with the Star One?
11     A   I received information from a source who
12 allegedly said -- that knows the individuals who
13 attempted to scuttle this vessel and gave some
14 information, which I acted on and obtained records in
15 order to put it together so I could present the case
16 to the State Attorney's Office.
17     Q   Okay.  Now, you mentioned a source.  It
18 is my understanding that this is a confidential
19 source.
20     A   It's a source, confidential, to the point
21 that since there is still an active investigation with
22 the Department of Insurance Fraud in Florida, at this
23 point, yes, it's considered a confidential source.
24     Q   And I spoke with your legal department
25 beforehand and I was advised that you cannot disclose

---

Page 7

1  the name of that source.
2      A   At this point, because of the open
3  investigation with that department, that unit, I
4  cannot disclose it at this point.
5      Q   Is this source a person that you would
6  consider to be a reliable --
7          MR. KARCHER:  Object to form.
8      Q   -- without identifying who the person is.
9      A   With the information that she obtained
10 together with the information that I was able to
11 prove, I considered that she was, for the most part,
12 reliable with the statements she gave me.
13     Q   The confidential source identified
14 individuals who were involved with the attempted
15 scuttling of the vessel?
16     A   Yes.
17     Q   What individuals were identified by the
18 source as being the individuals involved with
19 scuttling the boat?
20     A   An individual by the name of Figueredo
21 and MacKenzie.
22     Q   Would that be Bobby Figueredo?
23     A   Yes, that's it.
24     Q   And the MacKenzie, is that Eric
25 MacKenzie?

---

Page 8

1      A   Yes.
2      Q   Did the source provide you with any
3  information as to why these two individuals took it
4  upon themselves to try to sink the Star One?
5          MR. KARCHER:  Object to the form.  You
6  can answer.
7      A   It was money driven.
8      Q   When you say money driven, what do you
9  mean?
10     A   They were getting paid in order to go
11 ahead and scuttle the vessel.
12     Q   Did the source mention who they were
13 being paid by?
14     A   The source mentioned the owners were the
15 Estrellas.  Star One was the vessel.
16     Q   Did the source link the Estrellas with
17 the source of the money that was supposed to be used
18 to compensate Figueredo and MacKenzie for scuttling
19 the boat?
20         MR. KARCHER:  Object to form.
21     A   I was never -- I wasn't able to find out
22 if there's any other monies ever transferred to him or
23 to anybody.
24     Q   What I'm is, is the source that told you
25 that they were paid, did the source tell you that the

Case 1:10-cv-20935-KMM Document 125-1 Entered on FLSD Docket 06/14/2011 Page 3 of 21
Case 1:10-cv-20935-JLK Document 125-1 Entered on FLSD Docket 04/20/2011 Page 3 of 21

3 (Pages 9 to 12)



Page 9

1  owner of the boat paid these people or were intending
2  to pay these people to scuttle the boat?
3          MR. KARCHER: Object to form.
4      A   I don't remember her saying they got
5  paid. Obviously, she said it's common sense that it
6  would be the owners.
7      Q   Was any amount ever mentioned as to the
8  amount that Figuredo or MacKenzie were to be paid for
9  scuttling the boat?
10     A   She believes that they got paid six
11 figures.
12     Q   Did the source advise you as to the
13 source of her knowledge, how she became aware of this
14 event?
15     A   According to the source, she said that
16 she was told at one point that they did it, by them.
17     Q   Was the source involved at all with
18 either transporting Figuredo or MacKenzie to the boat
19 or picking them up?
20     A   Some of that information I cannot divulge
21 at this point. But she had first-hand knowledge that
22 she was told that they were involved.
23     Q   Did she have any involvement at all, even
24 unknowing, with respect to facilitating the activities
25 of Figuredo and MacKenzie?

Page 10

1      A   She didn't have any direct connection for
2  any type of crime that I was able to prove.
3      Q   What you're telling me is that you have
4  other information, but you can't disclose it today?
5      A   At this point, yes.
6      Q   Were you able to learn of any prior
7  activities of Figuredo and/or MacKenzie on the Star
8  One before the date she was consulted?
9      A   The information that I obtained through
10 the source, as well as some information that I
11 obtained through my investigation, that said that he
12 has been on that vessel and he somewhat had captained
13 the vessel in the past.
14     Q   Were you ever made aware of a fire
15 onboard or the necessity to tow the boat back while
16 Figuredo was at the helm?
17         MR. KARCHER: Object to form.
18     A   The information that I obtained did
19 mention about a fire, which may have actually caused
20 the vessel to be disabled and they were towed in.
21     Q   When you say they were towed in, who was
22 identified as being on board the boat through your
23 source at the time the boat had the fire and required
24 towing in.
25         MR. KARCHER: Object to form.

Page 11

1      A   Figuredo.
2      Q   And were you later able to determine
3  whether this event ever occurred?
4      A   Yes.
5      Q   Were you able to develop any information
6  about the relationship of Bobby Figuredo and Eric
7  MacKenzie, their relationship together?
8      A   Through my investigation, I was able to
9  confirm that they were at least acquaintances and they
10 did speak to each other.
11     Q   Were you able, through your
12 investigation, to determine the relationship of Bobby
13 Figuredo and Mr. Estrella?
14     A   Only to the information that I was told
15 by the source, that they were -- that he captained the
16 boat at one time and he was somewhat of a family
17 friend.
18     Q   Who is an individual by the name of Joe
19 with respect to this scenario?
20         MR. CANNING: Object to form. Go ahead.
21     A   Unfortunately, I don't really recall who
22 Joe was. There are several names in this
23 investigation, but I can't remember at this point
24 exactly who he was.
25     Q   Do you remember there was a name of a

Page 12

1  person named Joe that was associated somehow with the
2  scuttling?
3      A   I can't say exactly who this person was.
4  I have an idea, but I'd rather not say because I'm not
5  sure.
6      Q   Where you investigating any particular
7  type of automobiles that were seen at or around the
8  boat at the time MacKenzie and Figuredo left?
9          MR. KARCHER: Object to form.
10     A   According to the information I obtained
11 there was a vehicle that was in the immediate area, a
12 black vehicle. But there was no confirmation who or
13 what the vehicle belonged to.
14     Q   What additional investigation did you
15 conduct that we have not discussed at this time?
16     A   Well, through the course of my
17 investigation, I subpoenaed phone records as well as
18 bank records, which all that information was put
19 together and given to the State Attorney's Office.
20     Q   And I understand, again from speaking
21 with your legal, that that information is also
22 confidential?
23     A   At this point, yes.
24     Q   You cannot disclose that?
25     A   That's correct.

Case 1:10-cv-20935-KMM Document 198-1 Entered on FLSD Docket 06/14/2011 Page 4 of 21
Case 1:10-cv-20935-JLK Document 128-1 Entered on FLSD Docket 04/20/2011 Page 4 of 21

4 (Pages 13 to 16)

Page 13

```
 1       Q    What action did the State Attorney's
 2   Office take?
 3       A    The State Attorney's Office concluded
 4   that the evidence, at that point when I submitted the
 5   case, the statement they considered somewhat bias and
 6   more evidence had to be obtained in order to further
 7   the criminal case in this case in fact.
 8       Q    Did you attempt to locate and interview
 9   Bobby Figueredo?
10       A    Yes.
11       Q    And were you successful in that regard?
12       A    No.
13       Q    Did you attempt to locate and interview
14   Eric MacKenzie?
15       A    Yes.
16       Q    And were you successful in that regard?
17       A    No.  Several attempts.
18       Q    Do you consider the interview of
19   Figueredo and MacKenzie to be crucial to developing a
20   case?
21       A    Could you repeat that question one more
22   time, please?  I'm sorry.
23       Q    Do you consider interviewing Figueredo
24   and MacKenzie to be critical in moving the case
25   forward?
```

Page 14

```
 1       A    Absolutely.
 2       Q    What information did you develop as to
 3   the whereabouts of Bobby Figueredo?
 4       A    The information I was able to obtain was,
 5   he was living with his mother.  I attempted to talk to
 6   his mother several times.  She said she didn't know
 7   where he was.
 8       Q    Was his mother cooperative?
 9       A    Not really.
10       Q    And were you ever able to develop any
11   information as to Eric MacKenzie's whereabouts?
12       A    I went to the registered addresses that
13   are on file and in public records and was never able
14   to get in touch with him.
15       Q    Was your confidential source able to
16   place Figueredo and MacKenzie on the Star One?
17       MR. KARCHER:  Object to form.
18       A    She said that they were on the boat.
19       Q    Did the confidential source ever disclose
20   the motive why Bobby and Eric undertook this action?
21       A    She reiterated that it was strictly
22   monetary reasons.
23       Q    There was no reference to personal animus
24   or revenge or anger involved?
25       A    It's all about the money, according to
```

Page 15

```
 1   her.
 2       Q    Did there come a point in time that you
 3   contacted Neil Sullivan at Chubb's Special
 4   Investigation Unit?
 5       A    Yes.
 6       Q    How did that come about?
 7       A    I wanted to verify -- That was during the
 8   initial course of my investigation with the
 9   information that I obtained with the statement of the
10   source.  I wanted to see if things of that nature did
11   actually occur.  I was able to find out that -- He was
12   one of, I guess, the investigators for the insurance
13   company.  And he confirmed some of the information
14   that I obtained.  So that's why I kept on furthering
15   my case.
16       Q    Who instituted contact between the
17   Miami-Dade Police Department and Federal Insurance
18   Company?
19       A    If I'm not mistaken it was the Chubb
20   Insurance together with National Insurance Crime
21   Bureau, which is the liaison for us.
22       Q    What I'm saying is, did you contact
23   Mr. Sullivan initially?
24       A    I contacted Mr. Sullivan, yes.
25       Q    And when you contacted Mr. Sullivan, that
```

Page 16

```
 1   was after the point in time you had developed some
 2   information with respect to the Star One?
 3       A    Correct.
 4       Q    And what information did you convey to
 5   Mr. Sullivan?
 6       A    The confirmation of the loss.  If the
 7   vessel was scuttled.  I was able to obtain case
 8   numbers and information that was pretty basic that I
 9   could obtain myself through public means, which added
10   some credibility to the information that I obtained
11   with the source.
12       Q    When you initially contacted
13   Mr. Sullivan, what did you tell him about the status
14   of your investigation?
15       A    That it was ongoing at that point.
16       Q    Did you ever provide Mr. Sullivan with
17   some of the information that you disclosed today, such
18   as the information that your source had identified
19   Mr. MacKenzie and Mr. Figueredo as individuals who
20   were involved with the scuttling of the boat?
21       A    Well, I did confirm that there were
22   individuals of interest in this investigation.  And
23   just as well, I confirmed that the Estrellas owned the
24   vessel, who else was involved.  I was able to obtain
25   information, together with the information that
```

## Page 17

1 Mr. Sullivan gave, who were his sons, things of that
2 nature.
3     Q   Now, you said that the Department of
4 Insurance Fraud and the NICB currently have the case?
5     A   It's mainly the Department of Insurance
6 Fraud. NICB is just the liaison between law
7 enforcement and the law enforcement of these entities.
8     Q   What is your understanding as to the
9 status of the case with Department of Insurance Fraud?
10     A   It is still an open ongoing case at this
11 point.
12     Q   And is that the reason why you can't
13 disclose more specific information?
14     A   That is correct.
15     As of even 6:00 yesterday afternoon, I
16 confirmed that it's still an ongoing open
17 investigation.
18     Q   Is there anything else that you may know
19 about either the individuals who scuttled the boat,
20 their motive or the events leading up to the scuttling
21 that you can disclose that we haven't discussed?
22     A   At this point, the information that I
23 gave today is pretty much the extent of what I'm
24 allowed.
25     MR. FERTIG: Thank you. I have nothing

## Page 18

1 further.
2            CROSS-EXAMINATION
3 BY MR. KARCHER:
4     Q   Good morning. My name is Michael
5 Karcher. I'm here on behalf of Nicholas Estrella. I
6 have just some follow-up questions for you.
7     You said a few minutes ago that you
8 confirmed that this is still an open and ongoing case
9 with the Florida Department of Insurance.
10     Is this still an open and ongoing case
11 with the Miami-Dade Police Department?
12     A   Not -- They pretty much took over the
13 whole case.
14     Q   So when you say they took over the whole
15 case, what does that mean?
16     A   That they were going to use other means,
17 other angles, other forms of investigation, since they
18 are more capable, as the entity that strictly
19 investigates criminal insurance fraud, they have more
20 means and manpower than we do here.
21     Q   So is it fair to say, at least from the
22 point of view of the Miami-Dade Police Department,
23 that this case is finished or closed?
24     A   My case is closed as to the point --
25 since the insurance fraud entity got involved, I took

## Page 19

1 a back seat and they're the ones who actually are the
2 lead.
3     Q   When did you close or take a back seat to
4 that?
5     A   Well, pretty much right after I spoke to
6 the State Attorney's Office with the information, the
7 initial information, that I obtained from my personal
8 investigation. Right after that is when the
9 Department of Insurance Fraud got involved.
10     Q   Approximately what date was that?
11     A   I don't recall.
12     Q   Weeks ago? Months ago? A year ago?
13     A   It was probably close to a year.
14     Q   Now, you said that you presented
15 information to the Miami-Dade State Attorney's Office?
16     A   Yes.
17     Q   Can you tell us how that process works?
18 What do you present them with?
19     A   The actual case in a summary. Not too
20 much in depth with the technical part of it, but the
21 pertinent evidence that I was able to show, if this
22 was enough to go ahead and further a criminal action
23 against anybody that I was looking at at that point.
24     Q   When you say further a criminal action
25 against anybody, were there any specific names that

## Page 20

1 you were looking to further a criminal investigation
2 against or a criminal action against?
3     A   Well, if the owners were involved in the
4 case, they would be the suspects together with the
5 other individuals which I mentioned earlier, Figueredo
6 and MacKenzie.
7     Q   Did you go to the State Attorney's Office
8 with the intention of having them begin a case against
9 Mr. Figueredo, Mr. MacKenzie and/or Mr. Estrella?
10     A   If they said so, if they gave me the
11 actual approval, yes, I would have.
12     Q   All right. When you go to them, is it
13 for these individuals? Do you give names that you're
14 presenting a case for fraud against Mr. Figueredo or
15 Mr. MacKenzie?
16     A   Everything that I had I gave them.
17     Q   But do you specifically say I am
18 presenting a case for you to bring an action or go
19 forward with a criminal action against Mr. Figueredo,
20 or Mr. Estrella or Mr. MacKenzie?
21     A   I mentioned it to them, yes.
22     Q   And what action, if any, did they take?
23     A   I guess they reviewed what I had
24 presented to them. And they came back with the answer
25 that, at this point with the evidence that I had given

Case 1:10-cv-20935-KMW Document 198-1 Entered on FLSD Docket 06/14/2011 Page 6 of 21
Case 1:10-cv-20935-JLK Document 125-1 Entered on FLSD Docket 04/20/2011 Page 6 of 21

6 (Pages 21 to 24)

Page 21

1  them, it would not be enough to further a criminal
2  action at this point. And that's when the rest of the
3  entities started getting involved.
4      Q    All right. Approximately when did the
5  State Attorney's Office come back to you and tell you
6  that there was not enough evidence for them to go
7  forward and bring a charge or a claim against any of
8  these people for insurance fraud?
9      A    I don't recall exactly.
10     Q    Is that weeks ago? Months ago?
11 Approximately a year ago?
12     A    Approximately a year ago.
13     Q    And is it your understanding that the
14 State Attorney's took a look at this and said there
15 was no evidence or there wasn't enough to, at least,
16 issue either an arrest warrant or a claim to go
17 further --
18     A    Correct.
19     Q    -- against Mr. Figueredo, Mr. MacKenzie?
20     A    (Witness nods head).
21     Q    You're nodding your head, but she can't
22 write that down.
23     A    At that point, with the information, with
24 the initial investigation that I had, that's exactly
25 what they said; there had to be more evidence in order

Page 22

1  to further the case.
2      Q    And that was about Mr. Figueredo,
3  Mr. MacKenzie and Mr. Estrella?
4      A    Yes.
5      Q    Were there any other -- You used the
6  phrase earlier that you confirmed that there were
7  other individuals of interest. What other individuals
8  or who were the other individuals of interest in this
9  case?
10     A    Well, anybody involved in this case. It
11 could have been from the previous captains, to the
12 sons of Mr. Estrella, to the individual who towed the
13 vessel back. All these individuals are individuals of
14 interest.
15     Q    When you use the phrase individuals of
16 interest, can you tell us what you mean by that?
17     A    That with facts and confirmation of
18 evidence, that I would either rule them as a witness
19 or a suspect.
20     Q    At this point, or at the point where you
21 closed your investigation, who were those individuals
22 of interest that you considered suspects?
23     A    Well, at that point it was strictly
24 Figueredo and MacKenzie. But since the owner of the
25 vessel was possibly involved, he was, according to my

Page 23

1  investigation, also a suspect.
2      Q    And was his name also presented as a
3  possible suspect to the State Attorney's Office?
4      A    Yes. Absolutely.
5      Q    And the State Attorney's Office declined
6  to go forward with this case one way or the other?
7      A    With that information at that point, yes.
8      Q    Have they received any other information
9  since then?
10     A    I do not know what level, what status the
11 investigation with the Department of Insurance Fraud
12 is at.
13     Q    Who was the specific State Attorney that
14 you gave this information to?
15     A    William McGee. Bill McGee.
16     Q    Bill McGee? William McGee?
17     A    Yes.
18     Q    And have you had any other contact or
19 discussion with Mr. McGee or anyone else from the
20 State Attorney's Office regarding this case since they
21 turned it down?
22     A    No.
23     Q    You used a phrase earlier when discussing
24 this, you said that the State Attorney's considered
25 this bias driven.

Page 24

1      Could you tell us, first, what exactly
2  did they say or what did they mean by that this case
3  was bias driven?
4      A    That there had to be more evidence, more
5  confirmed evidence that the information that was given
6  to me by the source was unbias. Since the individual
7  who gave me the information was personally known to
8  them, according to them, they didn't know if -- There
9  had to be more. There had to be more. Not just a
10 hearsay.
11     Q    When you say bias driven, did you suspect
12 that there was some bias that the confidential
13 informant had against the possible suspects?
14     A    There was a possibility.
15     Q    What bias did you suspect or was possible
16 that they would have had -- the confidential informant
17 would have had against the possible suspects?
18     A    That information right now is privileged
19 to the entity that is investigating at this point. I
20 can't divulge why.
21     Q    When you say the entity investigating it,
22 meaning the Florida Department of Insurance?
23     A    That's correct.
24     Q    But it's your understanding that this
25 State Attorney's Office considered this somewhat bias

Case 1:10-cv-20933-KMW Document 198-1 Entered on FLSD Docket 06/14/2011 Page 7 of 21
Case 1:10-cv-20933-JLK Document 125-1 Entered on FLSD Docket 04/20/2011 Page 7 of 21

7 (Pages 25 to 28)

---

Page 25

1  driven?
2      A   That's what they said.
3      Q   That's what they said to you, that the
4  information that they gave you was somewhat bias
5  driven?
6      A   The statement.
7      Q   Okay. You said the statement. Did the
8  confidential informant give you a written statement?
9      A   Verbal mainly.
10      Q   When you say mainly, that assumes --
11      A   She also gave me a written statement,
12  more like notes that she wrote for herself. She also
13  gave me that, too.
14      Q   You said she gave you notes. Did you sit
15  down and take any kind of written statement from her
16  or a taped statement, examination under oath, a sworn
17  statement?
18      A   I took a sworn statement.
19      Q   And was that sworn statement turned over
20  to the State Attorney's Office?
21      A   No.
22      Q   Was that sworn statement turned over to
23  the Florida Department of Insurance?
24      A   That's up to them. They could obtain it.
25      Q   Who has custody of this sworn statement?

---

Page 26

1      A   I do.
2      Q   You said you did not turn the sworn
3  statement over to the State Attorney's Office?
4      A   No, I did not.
5      Q   Is there any reason why you didn't
6  give --
7      A   Because, again, what I mentioned before,
8  the statement that was given by her, they considered
9  it to be bias.
10      Q   But that same statement, the one that
11  they considered bias, that is now sitting with the
12  Florida Department of Insurance?
13      A   I don't know if it's there or not.
14      Q   Do you know if the Florida Department of
15  Insurance has taken any further action on this since
16  you turned this information over to them?
17      A   I have no idea.
18      Q   You haven't been contacted since then?
19      A   Not personally, no.
20      Q   Not personally? How would you otherwise
21  have been contacted? Through your office or through
22  your superiors?
23      A   Since I was the one initially with this
24  case, it would have been directly to me. But they
25  could have also obtained information from other

---

Page 27

1  entities, National Insurance Crime Bureau, from the
2  insurance companies.
3      Q   But to the best of your knowledge have
4  you been contacted by any other organizations or
5  individuals regarding your investigation of this case
6  since you turned it over to the State Attorney's
7  Office or the Department of Insurance Fraud?
8      A   The only one that I'm aware of is the
9  Department of Insurance Fraud.
10      Q   When was your last contact with the
11  Department of Insurance Fraud?
12      A   6:00 yesterday.
13      Q   That was you contacting them to see if it
14  was an ongoing investigation?
15      A   Yes.
16      Q   And they said, yes, it's an ongoing
17  investigation?
18      A   (Witness nods head).
19      Q   Prior to your asking if this was still an
20  open or ongoing investigation, when was the last time
21  you had any discussion with them?
22      A   A few months.
23      Q   Initially you said you received
24  information back in June of 2009 of a possible fraud
25  in this case. Who did you originally receive that

---

Page 28

1  information from?
2      A   From the source.
3      Q   Did the confidential informant contact
4  you or this office directly?
5      A   Yes.
6      Q   Did they tell you why they came to you or
7  your office directly?
8      A   Because they wanted to give information
9  on a crime.
10          We get these type of leads every day, all
11  day long.
12      Q   When you say you get these leads, it's
13  where someone calls and says I want to give
14  information about a crime?
15      A   Yes.
16      Q   Was there ever any discussion regarding a
17  reward for any of this type of information?
18      A   She was aware of it.
19      Q   When you say she was aware of it, can you
20  tell me what information she was aware of?
21      A   She knew that there was a reward for that
22  vessel.
23      Q   Do you know what the reward was?
24      A   I don't know an exact number for the
25  reward, no.

Case 1:10-cv-20935-KMM Document 198-1 Entered on FLSD Docket 06/14/2011 Page 8 of 21
Case 1:10-cv-20935-JLK Document 126-1 Entered on FLSD Docket 04/20/2011 Page 8 of 21

8 (Pages 29 to 32)

## Page 29

1    Q   Did you know or did anyone from the
2  insurance company or, for that matter, anyone else
3  ever inform you that there was a $50,000 reward for
4  information about the loss of this vessel?
5    A   That sounds correct.
6    Q   You said she was aware of it. How do you
7  know she was aware that there was a reward for
8  information concerning the loss of this vessel?
9    A   She found out somehow.
10    Q   And was that prior to her contacting your
11  office?
12    A   No. After the initial contact, she asked
13  me is there a reward for this vessel and I said yes.
14    Q   And is there also a reward from your
15  office or is it just the reward that's offered by the
16  insurance company?
17    A   We don't offer reward.
18    Q   But she certainly was aware of the
19  insurance company's $50,000 award?
20    A   After the initial statement she gave me,
21  yes.
22    Q   You said after the initial statement.
23  Was that when she first mentioned it or do you know if
24  she had any knowledge of it beforehand?
25    A   She did not mention it to me. She first

## Page 30

1  gave me the information and then afterwards she asked
2  me if there was a reward.
3    Q   Just, I guess, to clear it up for the
4  record, what was the name of the confidential
5  informant?
6    A   I'm not able to divulge this information
7  due to the reason that there is an ongoing
8  investigation at this point by another entity.
9    Q   I just wanted to be clear on the record
10  that, if asked, you are not going to give the
11  information as to the name of the confidential
12  informant.
13    The information you received from her,
14  you made the comment that she said it was money
15  driven. Can you expand on that or tell us what she
16  said which would lead you to say it was a money-driven
17  action?
18    A   Straight out, that he was hired to go and
19  scuttle the boat for money.
20    Q   When you say he, who are you referring
21  to?
22    A   Figueredo.
23    Q   Did you ask her who hired Mr. Figueredo
24  to take this boat?
25    A   She said the owners of the vessel,

## Page 31

1  Estrella.
2    Q   You made a comment earlier, when asked
3  who paid them, you said that she said, well, it's
4  common sense that the owner would.
5    Did she at any time specifically say the
6  owner hired Bobby Figueredo to take this boat in an
7  attempt to scuttle it?
8    A   If I recall right, it was common sense
9  it's the owner who is doing it. That's pretty much
10  what I remember of her statement.
11    Q   I'm not asking -- But whether it is
12  common sense or not, did she ever at any time say the
13  owner of the vessel hired Bobby Figueredo to sink this
14  boat? Or did she just say, hey, it's common sense
15  that the owner would do it?
16    A   That if she had actual proof or
17  conversation directly with Mr. Estrella or she was
18  present and witnessed? Is that what you're asking?
19    Q   I'll start at the beginning.
20    First, did she ever say the owner of the
21  boat, Nicholas Estrella, hired Bobby Figueredo to
22  scuttle this boat?
23    A   She mentioned it, yes, that she assumed
24  it's common sense. But, obviously, I was not able to
25  prove in my investigation that she actually physically

## Page 32

1  witnessed a conversation or any paperwork or anything
2  of that case that would make that true.
3    Q   Did she ever say that someone told her
4  that the owner of the vessel hired Bobby Figueredo?
5  Or is she just saying, hey, it's an assumption or it's
6  common sense that the owner would be the person to do
7  it?
8    A   I don't recall exactly how she -- That
9  specifically, I don't recall that.
10    Q   You also said that the confidential
11  informant -- And you keep saying she. So, at least
12  for today's conversation, I assume it's a woman. Is
13  it a woman?
14    A   If I say she, yes, she is.
15    Q   Okay. You said that she said that they
16  got paid. First and foremost, when you said they got
17  paid, the "they" that you're referring to is -- Well,
18  who is the "they" that she was talking about?
19    A   She was talking about Figueredo.
20    Q   Do you know if Mr. MacKenzie got paid
21  anything?
22    A   I have no evidence of that.
23    Q   Do you know if anyone else got paid? Or
24  did she say that anyone else got paid?
25    A   I have no other evidence except for what

Case 1:10-cv-20938-KMM   Document 198-1   Entered on FLSD Docket 06/14/2011   Page 9 of 21
Case 1:10-cv-20938-JLK   Document 125-1   Entered on FLSD Docket 04/20/2011   Page 9 of 21

9 (Pages 33 to 36)

## Page 33

1  she said regarding Figueredo.

2      Q  You said you also subpoenaed some bank

3  records. Whose bank records did you subpoena?

4      A  Figueredo's.

5      Q  Anyone else besides Figueredo's?

6      A  No. I think it was just Figueredo's.

7      Q  Was there anything, as a result of your

8  subpoena of his bank records, which showed that he may

9  have gotten paid or which led you to suspect he may

10  have gotten paid for this alleged --

11      A  I don't have the liberty to actually

12  mention or state anything of that nature.

13      Q  Okay. You said she believes they got

14  paid six figures.

15      A  Yes.

16      Q  Did she say that they actually got paid

17  something to do this, I guess, up front would be

18  the --

19      A  Her statement was they got paid. And

20  then I would ask how much did they get paid and she

21  did not know the exact numbers, because they didn't

22  tell her what the actual figure was. But she assumed

23  that it was six figures.

24      Q  Did she tell you what she based that

25  assumption on?

## Page 34

1      A  No.

2      Q  Did she at any time say I was told that

3  Bobby was paid?

4      A  No.

5      Q  She just assumed that it was a lot, six

6  figures?

7      A  Yes.

8      Q  Did you obtain any documents or photos or

9  other items which you would consider evidence other

10  than her written statement?

11      A  Well, there was information that I

12  obtained through subpoenas that furthered my case.

13  And, again, I can't specify what it is; I'm not at

14  liberty to say.

15      Q  You can't tell with me one way or the

16  other without going into the details, but do you have

17  any photos, documents, fingerprints, written

18  statements from anyone else regarding this event?

19      A  I have information that furthered my

20  investigation that actually there was evidence and

21  that there was -- or, better said, confirmation of

22  what the statements of this individual gave, confirmed

23  most of the information she gave me, with the

24  subpoenas that I did, confirmed her statement.

25      Q  Can you tell us what subpoenas you put

## Page 35

1  out for this case?

2      A  I'm not at liberty to say at this point.

3      Q  Can you tell us if this information

4  confirmed that Bobby Figueredo was involved in this

5  taking of the boat and scuttling it?

6      A  I was able to confirm with the

7  information that she obtained -- sorry -- that she

8  gave me, I was able to confirm with the subpoenas that

9  I obtained that, again, confirmed what her statement

10  said.

11      Q  Were you able to confirm or did you

12  receive any information which would link the owner of

13  the vessel to this action?

14      A  No.

15      Q  You made a statement earlier that she was

16  told by them that they did it. Who is the "them" that

17  told her that they did it?

18      A  It was actually Figueredo.

19      Q  She said she was told by Bobby Figueredo

20  that he did this?

21      A  Correct.

22      Q  You also said that she had firsthand

23  knowledge. Could you tell us what firsthand knowledge

24  she said she had?

25      A  I'm not at liberty to say exactly what

## Page 36

1  her firsthand knowledge is.

2      Q  Mr. Fertig asked you do you know who Joe

3  was. And at the time when he was asking questions,

4  you weren't sure.

5      Do you have any information as to a

6  person who would be a person of interest who is known

7  as Joe in this case? Does that mean anything to you

8  one way or the other?

9      A  I believe one of the Estrella sons is

10  named Joe. I'm not sure. But I know there was

11  actually more than one Joe involved that I looked at.

12  But I'm not sure which Joe you're talking about.

13      Q  Do you know which Joe she was talking

14  about -- Well, first, do you know if the confidential

15  informant named Joe who was also involved

16  or that she said was involved with Bobby Figueredo?

17      A  I don't recall.

18      Q  Did you ever talk to Mr. Estrella, Sr.

19  concerning this incident?

20      A  No.

21      Q  Did you ever attempt to talk to Mr.

22  Estrella, Sr.?

23      A  No.

24      Q  Why would you talk to him or not talk to

25  him with regard to this?

## Page 37

1    A    There was no need to at that point.
2    Q    Has there ever been a need to talk to
3  him?
4    A    There was going to be if the State would
5  have approved the case.
6    Q    At this point the State found that there
7  wasn't enough evidence or probable cause to go
8  forward?
9    A    And then at that point, that's when the
10  Department of Insurance Fraud took over.
11    Q    Did you ever talk to Mr. Estrella, Jr.,
12  Nick Estrella, Jr.?
13    A    No.
14    Q    Other than the confidential
15  informant, what other individuals or persons did you
16  talk to -- and Mr. Sullivan I guess -- what other
17  individuals did you talk to regarding this case?
18    A    Some of that -- Actually, that
19  information I'm not privy to give you at this point.
20  That was turned over.
21    Q    You made a comment about a vehicle that
22  was in the immediate area. Can you tell us, first,
23  what immediate area are you talking about and then
24  what vehicle?
25    A    In the area where the vessel was docked.

## Page 38

1  According to the statement, a black vehicle drove
2  away.
3    Q    At any particular time?
4    A    In the morning.
5    Q    At seven or eight in the morning or at
6  three or four in the morning or --
7    A    I just recall in the morning, early in
8  the morning.
9    Q    Do you know whose vehicle that was
10  supposed to be?
11    A    I have no confirmation who that was.
12    Q    Do you know whose vehicle that was
13  suspected to be?
14    A    I did not confirm who that was.
15    Q    Did she tell you who she thought that
16  vehicle belonged to?
17    A    At this point I'm not at liberty to say
18  who she thought.
19    Q    And the immediate area, when you're
20  saying the immediate area, are you talking about --
21  Let me start again. What immediate area are we
22  talking about or did she mention?
23    A    I think it was where the vessel was
24  docked, in that area there.
25    Q    Mr. Estrella, Sr's. house?

## Page 39

1    A    I guess that's where the vessel was
2  docked, if I recall right, yes.
3    Q    You said you tried to contact Eric
4  MacKenzie and had not been able to at this point.
5    Other than checked with the phone
6  numbers, what other steps have you made to try and
7  contact Eric MacKenzie?
8    A    Just like the normal course of an
9  investigation, I went to all the addresses, contacts,
10  everything that I was able to find to locate this
11  individual, which resulted in a negative in every
12  which way.
13    Q    I'm a civil maritime lawyer; I don't get
14  involved in criminal investigations. What are the
15  normal things that you would do to try to contact
16  someone?
17    A    Houses, phone numbers, friends.
18    Q    Do you go to their houses and talk to --
19    A    Absolutely.
20    Q    Did you go to Mr. MacKenzie's last known
21  address?
22    A    Yeah. Absolutely.
23    Q    Was he still living there or do you know
24  if he was still living there?
25    A    Nobody was living there.

## Page 40

1    Q    Is there any kind of warrant out for
2  Mr. MacKenzie?
3    A    No.
4    Q    Same thing for Bobby Figueredo, what
5  steps did you take to try to locate Bobby Figueredo?
6    A    Same thing. I went ahead and went to the
7  different addresses; made phone calls; contacted his
8  mother; left messages; left cards; so on and so forth.
9    Q    At this point, you haven't spoken to
10  either of them?
11    A    That's correct.
12    Q    Are you still -- Are you or your
13  department still looking to speak to either Bobby
14  Figueredo or Eric MacKenzie?
15    A    Unless the State Attorney's Office or the
16  Department of Insurance Fraud requests our assistance.
17  And we will give them help of whatever they need.
18    Q    You made the comment that the
19  confidential informant said this was all about the
20  money, according to her. Did she give any other
21  reason why these two may have been involved with the
22  boat?
23    A    According to her statement that I recall,
24  that was it.
25    Q    You told us you contacted Mr. Neil

## Page 41

1  Sullivan at Chubb Insurance to verify certain
2  information. What information did you verify with
3  Mr. Sullivan?
4     A   There was a claim made.
5     Q   An insurance claim made on the boat?
6     A   Right. And clarification of some of the
7  information that I had obtained in my investigation.
8  That's pretty much it really. And then with that
9  information, case numbers and so on and so forth, I
10 went ahead and obtained copies myself, either through
11 subpoenas or through public records.
12    Q   My understanding is that a police report
13 and a theft report was filed on Key Biscayne
14 concerning this boat.
15        Did you ever speak to or work with any
16 Key Biscayne officers or Miami-Dade officers or
17 someone who may be involved with the theft claim that
18 was made on the boat?
19    A   No.
20    Q   Do you know if there was any
21 investigation that was made with regard to the theft
22 of this boat?
23    A   That I know of, no.
24    Q   Is your investigation completely separate
25 from whatever investigation there may or may not be

## Page 42

1  with regard to a vessel theft report?
2     A   That's correct.
3     Q   I mean, totally separate? They don't
4  contact you? You don't contact them?
5     A   If I'm not mistaken, I think they knew I
6  was investigating.
7     Q   When you say "they," who are they?
8     A   Key Biscayne.
9     Q   The police department?
10    A   I believe so.
11    Q   Did you ever at any time speak to anyone
12 from the Key Biscayne Police Department?
13    A   I believe I did.
14    Q   Do you recall who you spoke to?
15    A   No.
16    Q   Do you recall the substance of the
17 conversation?
18    A   I confirmed the report. That's pretty
19 much it, if there's any other information, any
20 supplements, any other information they might have
21 obtained after the fact.
22    Q   Do you know if there was any information
23 they received, as you said, after the fact?
24    A   Not to my knowledge.
25    Q   With regard to the Miami-Dade

## Page 43

1  investigation, now that the State Attorney's Office
2  has turned this down, is there any other action --
3  Well, is there any other action being taken by the
4  State Attorney's Office with regard to this case?
5     A   If the Department of Insurance Fraud,
6  obviously, compiles enough evidence according to what
7  the State Attorney's Office deems to be enough for a
8  criminal charge, obviously they would reopen it.
9     Q   At this point, to the best of your
10 knowledge, there has been no action by the Florida
11 Department of Insurance Fraud would require them
12 to contact the State Attorney's Office or you with
13 regard to this claim?
14    A   I personally do not know. And, if I did,
15 I wouldn't have the liberty to say.
16    Q   Is it your testimony that there may be a
17 claim going on with the State Attorney's Office?
18    A   I do not have that information at all.
19    Q   Not to belabor the point, but is it a
20 matter that you don't have the information or, if you
21 had it, you wouldn't tell me anyway?
22    A   I don't have the information. And, if I
23 did, that was up to them. I don't exactly know if
24 they are talking to them or not. I do not know that
25 information.

## Page 44

1     Q   Thank you.
2        With regard to any other information you
3  have other than the confidential informant's
4  statements, what documents, phone records, pictures
5  receipts or other items do you have in your possession
6  or did you turn over to the State Attorney's office?
7     A   At this point, I don't have liberty to
8  say.
9     Q   Do you know if there will come a point
10 when you may have liberty to say?
11    A   Either if the case is closed or there is
12 an arrest made, it becomes public information.
13    Q   With regard to the civil case, are you
14 planning on turning over any of this information to
15 either of the parties involved in this civil insurance
16 claim?
17    A   If there is an ongoing criminal
18 investigation, which I confirmed there is, it all
19 depends on the lead investigator of that investigation
20 or if the judge deems so.
21    Q   When you say if the judge deems so, which
22 judge are we talking about?
23    A   The civil judge. If I get ordered.
24        MR. KARCHER: Okay. Thank you. I don't
25 have any more questions for you at this time.

Page 45

1    REDIRECT EXAMINATION
2  BY MR. FERTIG:
3        Q    Detective Winch, just a few follow-ups.
4        When you went to the State Attorney's
5    Office and they said there's not enough information,
6    at that point what other information were you trying
7    to develop at that time but were unable to?
8        A    Again, to finish up the confirmation of
9    the statements from the source that she gave me. I
10   don't recall anything else.
11       Q    Were you trying to get in contact with
12   Mr. Figueredo --
13       A    That is correct.
14       Q    -- and Mr. MacKenzie?
15       A    That is correct. That was part of it. I
16   wanted to keep on trying to make contact with these
17   individuals.
18            And, again, when I found out that the
19   Department of Insurance Fraud was getting involved and
20   they met with me and they said they were taking over
21   the case, I, again, took a back seat.
22       Q    And as a matter of protocol and
23   procedure, when an organization such as the Department
24   of Insurance Fraud takes over a case, is that
25   essentially that there's a handover of information

Page 46

1    that you have to them and then they take the lead?
2        A    According to whatever they request, I'm
3    there to assist them in everything.
4        Q    And that would explain why you're no
5    longer actively trying to find Mr. Figueredo or
6    Mr. MacKenzie?
7        A    That's correct. If a request is given
8    from them directly, then I would go and assist them
9    any which way.
10       Q    Now, when this source contacted you
11   initially, this source volunteered this information
12   freely to you?
13       A    Yes.
14       Q    There was no contingent upon getting paid
15   for any information at that first conversation?
16       A    Money was never involved.
17       Q    And some of these statements that were
18   given to you by the confidential informant that you
19   were later able to corroborate, did that some of the
20   fire and being towed back to Miami? Was that some of
21   the information?
22       A    That's correct, yes.
23       Q    And were you aware of any other means
24   that this person would have had to have had this
25   information other than being told by someone who was

Page 47

1    on board?
2        A    That was pretty specific information that
3    I was able to confirm.
4        Q    And from what you've testified, I've
5    discerned that Bobby Figueredo was the person that was
6    providing the source with this information?
7            MR. KARCHER:  Object to form.
8        A    Yes.
9        Q    Let me ask it another way.
10           Was there anyone besides Bobby Figueredo
11   that the source said was the source of information
12   that she received?
13       A    He was the source.
14       Q    Were you ever able to identify a person
15   that may have driven the escape boat?
16       A    No.
17       Q    Were you aware that there had to have
18   been a getaway boat or an escape boat?
19           MR. KARCHER:  Object to form.
20       A    There had to be some other type of vessel
21   that had to get the individuals off that boat back to
22   safety.
23           MR. FERTIG:  Nothing further. Thank you.
24           RECROSS-EXAMINATION
25

Page 48

1  BY MR. KARCHER:
2        Q    Last follow-up questions. When was the
3    last time you tried to contact either Bobby Figueredo
4    or Eric MacKenzie?
5        A    Don't recall.
6        Q    A week? Months? A year?
7        A    Months. Almost a year.
8        Q    You said the comment that money was never
9    involved --
10           MR. FERTIG:  Objection to form. Oh, I
11   see, you're saying with the source. I'm sorry.
12       Q    You made the comment just a few minutes
13   ago that money was never involved with the source.
14           As far as you know, there certainly is no
15   money being offered by the Miami-Dade Police
16   Department?
17       A    Yes.
18       Q    But to your knowledge, there is a $50,000
19   reward being offered for information regarding the
20   loss of this vessel, and that the confidential
21   informant knew that there was money being offered for
22   the loss of this vessel?
23       A    She was aware of it.
24           MR. KARCHER:  Okay. Thank you. I don't
25   have anymore questions.

Case 1:10-cv-20838-KMW Document 128-1 Entered on FLSD Docket 08/24/2011 Page 13 of 24
Case 1:10-cv-20838-KMW Document 128-1 Entered on FLSD Docket 04/20/2011 Page 13 of 21

13 (Pages 49 to 52)

---

Page 49

1    FURTHER REDIRECT EXAMINATION
2  BY MR. FERTIG:
3       Q    Just one topic regarding the reward. Do
4  you know if the source ever contacted Federal
5  Insurance Company with respect to collecting the
6  reward?
7       A    I don't have that information.
8       Q    What, if anything, did the source ever
9  tell you about fears for her personal safety, if
10 anything?
11      A    She was afraid.
12      Q    And did she say why she was afraid?
13      A    She said she was afraid because she
14 thought the Estrellas are very powerful people.
15      Q    And connecting the dots, what did she
16 mean by that?
17      MR. KARCHER: Object to form.
18      Q    What was she afraid of?
19      A    Retribution.
20      Q    Is that the reason why this source wanted
21 to remain confidential?
22      A    That is correct.
23      MR. FERTIG: Thank you. I have nothing
24 further.
25      FURTHER RECROSS EXAMINATION

---

Page 50

1  BY MR. KARCHER:
2       Q    Did the source tell you that she was
3  afraid of some sort of action by the Estrellas?
4       A    Yes.
5       Q    Specifically what did she say?
6       A    She was afraid.
7       Q    After you were told that, did you take
8  any action or contact the Estrellas or look any
9  further into this?
10      A    No.
11      Q    Have you taken any action with regard to
12 the Estrellas in trying to determine the voracity of
13 this woman's statement?
14      A    No.
15      Q    Have you looked further into the
16 Estrellas with regard to this claim of insurance fraud
17 against Nicholas Estrella?
18      A    Repeat the question.
19      Q    Sure. Have you looked further into this
20 claim of insurance fraud against the Estrellas with
21 regard to the Estrellas themselves?
22      A    Unless the Department of Insurance Fraud
23 asked me to.
24      Q    Have you at this point looked into
25 connecting this crime allegation to Nicholas Estrella?

---

Page 51

1       A    When the case was turned over to the
2  Department of Insurance Fraud, I stopped looking.
3       Q    Prior to it being turned over, what
4  information or evidence or allegation did you turn
5  over to the State Attorney with regard to a claim for
6  insurance fraud against Nicholas Estrella?
7       A    That information right now I'm not at
8  liberty to say.
9       Q    One way or the other?
10      A    I'm not.
11      Q    Without telling me what the information
12 was, did you turn over any information other than what
13 you've told us about the confidential informant with
14 regard to Mr. Estrella himself?
15      A    No.
16      Q    All of the information that you turned
17 over to them was with regard to her statements
18 regarding that Bobby Figueredo was the person who took
19 this boat and attempted to scuttle it?
20      A    Again, that information I'm not at
21 liberty to say.
22      Q    Is there any information in which you
23 turned over to the State Attorney's Office or you
24 gathered in this investigation which you are at
25 liberty to tell us at this time that you haven't

---

Page 52

1  already covered?
2       A    All the information that I have was given
3  to the Department of Insurance Fraud.
4       Q    But is there any of that information
5  which you can divulge to us at this time?
6       A    No. If there's any questions regarding
7  that case, you have to direct the questions directly
8  to them.
9       Q    Specifically who at the Department of
10 Insurance Fraud have you been working with? Is there
11 a specific investigator?
12      A    Working with?
13      Q    Who is your contact with the Department
14 of Insurance Fraud?
15      A    There's an investigator. Her name is
16 Laura. I do not -- Her last name does not come to my
17 mind.
18      Q    And she's an investigator with the
19 Department of Insurance Fraud?
20      A    She's, I guess, the lead.
21      Q    As far as you're concerned, that's the
22 lead person that you've dealt with?
23      A    With the little contact that I've had
24 since the initial takeover of the case, yes.
25      Q    You don't know her last name, but Laura

---

Case 1:10-cv-20938-KMW  Document 128-1  Entered on FLSD Docket 08/24/2011  Page 14 of 21
Case 1:10-cv-20938-JMW  Document 128-1  Entered on FLSD Docket 04/20/2011  Page 14 of 21

14 (Pages 53 to 56)

**Page 53**

```
1    is an investigator there?
2         A    Correct.
3         Q    Anyone else?
4         A    No.
5         Q    You said it was Mr. McGee at the State
6    Attorney's Office?
7         A    Yes.
8         Q    William McGee?
9         A    Yes.
10        MR. KARCHER:  Thank you.  I don't have
11   any more questions.
12        MR. FERTIG:  I don't have anything else.
13   Thank you very much for your time today.
14        (Thereupon, the deposition was concluded
15   at 10:50 a.m.)
16
17
18
19
20
21
22
23
24
25
```

**Page 54**

ERRATA SHEET
RULE 1.310 FLORIDA RULES OF CIVIL PROCEDURE PROVIDES:

"(e) Any changes in form or substance which
      the witness desires to make shall be
      entered upon the deposition by the
      officer, with a statement of the reasons
      given by the witness for making them."

DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES BELOW

Page    Line    Change        Reason
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____
____    ____    _____

Please forward the original signed errata sheet to
this office so that copies may be distributed to all
parties.

DATE: _____

**Page 55**

SIGNATURE OF WITNESS: _____

**Page 56**

CERTIFICATE OF OATH WITH ACKNOWLEDGEMENT
STATE OF FLORIDA  )
COUNTY OF BROWARD )

     I, Nancy S. Johnson, the undersigned
authority, certify that the witness personally
appeared before me and was duly sworn.

     I also certify that I was authorized to
and did stenographically report the foregoing
deposition; and that the transcript is a true record
of the testimony given by the witness.
     I further certify that I am not a
relative, employee, attorney, or counsel of any of
the parties; nor am I a relative or employee of any
of the parties, attorney or counsel connected with
the action, nor am I financially interested in the
action.

     Dated this 18th day of April 2011.


     _____
     NANCY S. JOHNSON
     State of Florida.
     Notary Public, State of Florida
     Commission No. DD974832
     My Commission Expires: 4/2/2014

Page 57

DATE: 4-18-11
TO: Detective Christopher Winch
     C/O Miami-Dade Police Department
     1701 N.W. 87th Avenue
     Suite 100
     Doral, FL 33172

          IN RE: Estrella v. Federal Insurance

Dear Detective Winch,

          Please take notice that on 4-13-11 you
gave your deposition in the above-referred matter.
At that time you did not waive signature.  It is now
necessary that you sign your deposition.
          Your deposition is ready at United
Reporting, 1218 S.E. Third Avenue Fort Lauderdale,
Florida.  Please call our office at (954) 525-2221
and make arrangements to come in and read and sign
your deposition.


          Very truly yours,


          Nancy S. Johnson
          UNITED REPORTING, INC.


CC via transcript:  Christopher R. Fertig, Esq.
          Michael R. Karcher, Esq.

**A**

able 7:10 8:21 10:2
  10:6 11:2,5,8,11
  14:4,10,13,15
  15:11 16:7,24
  19:21 30:6 31:24
  35:6,8,11 39:4,10
  46:19 47:3,14
above-entitled 3:4
  3:15
above-referred
  57:8
Absolutely 14:1
  23:4 39:19,22
ACKNOWLEDG...
  56:1
acquaintances 11:9
acted 6:14
action 13:1 14:20
  19:22,24 20:2,18
  20:19,22 21:2
  26:15 30:17 35:13
  43:2,3,10 50:3,8
  50:11 56:10,10
active 6:21
actively 46:5
activities 5:2 9:24
  10:7
activity 6:1
actual 19:19 20:11
  31:16 33:22
added 16:9
additional 12:14
address 39:21
addresses 14:12
  39:9 40:7
advise 9:12
advised 6:25
afraid 49:11,12,13
  49:18 50:3,6
afternoon 17:15
age 3:14
ago 18:7 19:12,12
  19:12 21:10,10,11
  21:12 48:13
ahead 4:18 5:23
  8:11 11:20 19:22
  40:6 41:10
allegation 50:25
  51:4
alleged 33:10
allegedly 6:12
allowed 17:24
amount 9:7,8
and/or 10:7 20:9
anger 14:24

angles 18:17
animus 14:23
answer 8:6 20:24
anybody 8:23 19:23
  19:25 22:10
anymore 48:25
anyway 43:21
APPEARANCE
  2:1
appeared 56:4
appearing 2:3,5
approval 20:11
approved 37:5
Approximately
  19:10 21:4,11,12
April 1:15 3:10
  5:22 56:11
area 6:7 12:11
  37:22,23,25 38:19
  38:20,21,24
arrangements
  57:11
arrest 21:16 44:12
asked 29:12 30:1,10
  31:2 36:2 50:23
asking 27:19 31:11
  31:18 36:3
assist 46:3,8
assistance 40:16
associated 3:25
  12:1
Association 4:21
assume 32:12
assumed 31:23
  33:22 34:5
assumes 25:10
assumption 32:5
  33:25
attempt 13:8,13
  31:7 36:21
attempted 6:6,13
  7:14 14:5 51:19
attempts 13:17
attorney 23:13 51:5
  56:8,9
Attorney's 6:16
  12:19 13:1,3 19:6
  19:15 20:7 21:5
  21:14 23:3,5,20
  23:24 24:25 25:20
  26:3 27:6 40:15
  43:1,4,7,12,17
  44:6 45:4 51:23
  53:6
authority 56:4
authorized 56:5
Auto 4:2

automobiles 12:7
Avenue 1:24 57:3
  57:10
award 29:19
aware 5:6,13,17 6:3
  6:9 9:13 10:14
  27:8 28:18,19,20
  29:6,7,18 46:23
  47:17 48:23
Azimut 4:24
a.m 1:16 3:11 53:15

**B**

back 10:15 19:1,3
  20:24 21:5 22:13
  27:24 45:21 46:20
  47:21
Bahamas 6:7
bank 4:12:18 33:2
  33:3,8
based 33:24
basic 16:8
beginning 31:19
behalf 1:14 2:3,5
  3:2 18:5
belabor 43:19
believe 5:8 36:9
  42:10,13
believes 9:10 33:13
belonged 12:13
  38:16
best 27:3 43:9
better 34:21
bias 13:5 23:25
  24:3,11,12,15,25
  25:4 26:9,11
Bill 23:15,16
Biscayne 5:21
  41:13,16 42:8,12
black 12:12 38:1
board 10:22 47:1
boat 6:4 7:19 8:19
  9:1,2,9,18 10:15
  10:22,23 11:16
  12:8 14:18 16:20
  17:19 30:19,24
  31:6,14,21,22
  35:5 40:22 41:5
  41:14,18,22 47:15
  47:18,18,21 51:19
boats 4:7,14,15
Bobby 7:22 11:6,12
  13:9 14:3,20 31:6
  31:13,21 32:4
  34:3 35:4,19
  36:16 40:4,5,13
  47:5,10 48:3

51:18
bring 20:18 21:7
BROWARD 56:2
Bureau 4:1 15:21
  27:1

**C**

call 57:10
called 4:2,20
calls 28:13 40:7
CANNING 2:2
  11:20
capable 18:18
captained 10:12
  11:15
captains 22:11
cards 40:8
cars 4:6
case 1:2 5:24 6:1,15
  13:5,7,7,20,24
  15:15 16:7 17:4,9
  17:10 18:8,10,13
  18:15,23,24 19:19
  20:4,8,14,18 22:1
  22:9,10 23:6,20
  24:2 26:24 27:5
  27:25 32:2 34:12
  35:1 36:7 37:5,17
  41:9 43:4 44:11
  44:13 45:21,24
  51:1 52:7,24
cause 3:4,15 37:7
caused 10:19
Cay 6:7
CC 57:19
certain 41:1
certainly 29:18
  48:14
CERTIFICATE
  56:1
certified 4:18
certify 56:4,5,8
Change 54:6
changes 54:2,5
charge 21:7 43:8
checked 39:5
Christian 1:10 3:1
  3:13,20
Christopher 2:4
  57:2,19
Chub 6:7
Chubb 15:19 41:1
Chubb's 15:3
City 3:9 5:20
civil 39:13 44:13,15
  44:23 54:1
claim 21:7,16 41:4

41:5,17 43:13,17
  44:16 50:16,20
  51:5
clarification 41:6
clear 30:3,9
close 19:3,13
closed 18:23,24
  22:21 44:11
collecting 49:5
come 15:2,6 21:5
  44:9 52:16 57:11
commencing 3:10
comment 30:14
  31:2 37:21 40:18
  48:8,12
Commission 56:16
  56:16
common 9:5 31:4,8
  31:12,14,24 32:6
companies 27:2
company 1:7 15:13
  15:18 29:2,16
  49:5
company's 29:19
compensate 8:18
compiles 43:6
completely 41:24
concerned 52:21
concerning 29:8
  36:19 41:14
concluded 13:3
  53:14
conduct 12:15
confidential 6:18
  6:20,23 7:13
  12:22 14:15,19
  24:12,16 25:8
  28:3 30:4,11
  32:10 36:14 37:14
  40:19 44:3 46:18
  48:20 49:21 51:13
confirm 11:9 16:21
  35:6,8,11 38:14
  47:3
confirmation 12:12
  16:6 22:17 34:21
  38:11 45:8
confirmed 15:13
  16:23 17:16 18:8
  22:6 24:5 34:22
  34:24 35:4,9
  42:18 44:18
connected 56:9
connecting 49:15
  50:25
connection 10:1
consider 7:6 13:18

13:23 34:9
considered 6:23
  7:11 13:5 22:22
  23:24 24:25 26:8
  26:11
consulted 10:8
contact 15:16,22
  23:18 27:10 28:3
  29:12 39:3,7,15
  42:4,4 43:12
  45:11,16 48:3
  50:8 52:13,23
contacted 15:3,24
  15:25 16:12 26:18
  26:21 27:4 40:7
  40:25 46:10 49:4
contacting 27:13
  29:10
contacts 39:9
contingent 46:14
conversation 31:17
  32:1,12 42:17
  46:15
convey 16:4
cooperative 14:8
copies 41:10 54:22
correct 12:25 16:3
  17:14 21:18 24:23
  29:5 35:21 40:11
  42:2 45:13,15
  46:7,22 49:22
  53:2
corroborate 46:19
counsel 56:8,9
COUNTY 56:2
course 5:1 12:16
  15:8 39:8
Court 1:1 3:5
covered 52:1
credibility 16:10
crime 4:1,5,8 5:2
  10:2 15:20 27:1
  28:9,14 50:25
criminal 5:25 13:7
  18:19 19:22,24
  20:1,2,19 21:1
  39:14 43:8 44:17
critical 13:24
Cross-Examination
  2:11 18:2
crucial 13:19
currently 17:4
custody 25:25
C/O 57:2

**D**

D 2:7

date 1:15 5:21 10:8
  19:10 54:25 57:1
Dated 56:11
day 3:10 28:10,11
  56:11
DD974832 56:16
deal 4:6
dealt 52:22
Dear 57:6
declined 23:5
deems 43:7 44:20
  44:21
Defendant 1:8,14
  2:5 3:3
department 3:23,24
  3:25 6:22,24 7:3
  15:17 17:3,5,9
  18:9,11,22 19:9
  23:11 24:22 25:23
  26:12,14 27:7,9
  27:11 37:10 40:13
  40:16 42:9,12
  43:5,11 45:19,23
  48:16 50:22 51:2
  52:3,9,13,19 57:2
Department's 4:4
depends 44:19
Deponent 3:2,14
deposition 1:10 3:1
  53:14 54:3 56:6
  57:8,9,9,11
depth 19:20
desires 54:3
details 5:25 34:16
detective 1:10 2:10
  3:1,13,22 5:2 45:3
  57:2,6
determine 11:2,12
  50:12
develop 5:3 11:5
  14:2,10 45:7
developed 16:1
developing 13:19
different 40:7
direct 2:11 3:17
  10:1 52:7
directly 26:24 28:4
  28:7 31:17 46:8
  52:7
disabled 10:20
discerned 47:5
disclose 6:25 7:4
  10:4 12:24 14:19
  17:13,21
disclosed 16:17
discovery 3:3
discussed 12:15

17:21
discussing 23:23
discussion 23:19
  27:21 28:16
distributed 54:22
District 1:1,1 3:5,6
divulge 9:20 24:20
  30:6 52:5
docked 37:25 38:24
  39:2
documents 34:8,17
  44:4
doing 4:16 31:9
Doral 1:17 3:9 57:4
dots 49:15
driven 8:7,8 23:25
  24:3,11 25:1,5
  30:15 47:15
drove 38:1
due 30:7
duly 3:15 56:4

**E**

e 2:7 54:2
earlier 20:5 22:6
  23:23 31:2 35:15
early 38:7
Economic 4:1,5 5:2
eight 38:5
either 9:18 17:19
  21:16 22:18 40:10
  40:13 41:10 44:11
  44:15 48:3
employee 56:8,9
enforcement 4:11
  17:7,7
ENTER 54:5
entered 54:3
entities 17:7 21:3
  27:1
entity 18:18,25
  24:19,21 30:8
Eric 7:24 11:6
  13:14 14:11,20
  39:3,7 40:14 48:4
errata 54:1,21
escape 47:15,18
Esq 2:2,4 57:19,19
essentially 45:25
Estrella 1:4 4:25
  11:13 18:5 20:9
  20:20 22:3,12
  31:1,17,21 36:9
  36:18,22 37:11,12
  38:25 50:17,25
  51:6,14 57:5
Estrellas 8:15,16

16:23 49:14 50:3
  50:8,12,16,20,21
event 9:14 11:3
  34:18
events 17:20
evidence 3:4 13:4,6
  19:21 20:25 21:6
  21:15,25 22:18
  24:4,5 32:22,25
  34:9,20 37:7 43:6
  51:4
exact 28:24 33:21
exactly 11:24 12:3
  21:9,24 24:1 32:8
  35:25 43:23
examination 1:22
  2:11,12,12,13,13
  3:17 25:16 45:1
  49:1,25
Exhibits 2:16,17
expand 30:15
Expires 56:16
explain 46:4
extent 17:23

**F**

facilitating 9:24
fact 13:7 42:21,23
facts 22:17
fair 18:21
family 11:16
far 48:14 52:21
fears 49:9
Federal 1:7 15:17
  49:4 57:5
Fertig 2:4,4,11,12
  2:13 3:18 17:25
  36:2 45:2 47:23
  48:10 49:2,23
  53:12 57:19
Figueredo 7:20,22
  8:18 9:8,18,25
  10:7,16 11:1,6,13
  12:8 13:9,19,23
  14:3,16 16:19
  20:5,9,14,19
  21:19 22:2,24
  30:22,23 31:6,13
  31:21 32:4,19
  33:1 35:4,18,19
  36:16 40:4,5,14
  45:12 46:5 47:5
  47:10 48:3 51:18
Figueredo's 33:4,5
  33:6
figure 33:22
figures 9:11 33:14

33:23 34:6
file 14:13
filed 3:9 41:13
financially 56:10
find 8:21 15:11
  39:10 46:5
fingerprints 34:17
finish 45:8
finished 18:23
fire 10:14,19,23
  46:20
first 3:15 5:6 6:9
  24:1 29:23,25
  31:20 32:16 36:14
  37:22 46:15
firsthand 35:22,23
  36:1
first-hand 9:21
FL 57:4
Florida 1:1,17,24
  3:6,8,10 6:22 18:9
  24:22 25:23 26:12
  26:14 43:10 54:1
  56:2,15,15 57:10
follows 3:16
follow-up 18:6 48:2
follow-ups 45:3
foot 4:24
Force 4:2
foregoing 56:6
foremost 32:16
form 7:7 8:5,20 9:3
  10:17,25 11:20
  12:9 14:17 47:7
  47:19 48:10 49:17
  54:2
forms 18:17
Fort 1:24 57:10
forth 5:16 40:8 41:9
forward 13:25
  20:19 21:7 23:6
  37:8 54:21
found 6:5 29:9 37:6
  45:18
four 38:6
fraud 4:8,8,9 5:12
  6:22 17:4,6,9
  18:19,25 19:9
  20:14 21:8 23:11
  27:7,9,11,24
  37:10 40:16 43:5
  43:11 45:19,24
  50:16,20,22 51:2
  51:6 52:3,10,14
  52:19
freely 46:12
friend 11:17

friends 39:17
front 33:17
further 2:13,13
  13:6 18:1 19:22
  19:24 20:1 21:1
  21:17 22:1 26:15
  47:23 49:1,24,25
  50:9,15,19 56:8
furthered 34:12,19
furthering 15:14

**G**

gathered 51:24
generally 4:3
George 3:20
getaway 47:18
getting 8:10 21:3
  45:19 46:14
give 20:13 25:8
  26:6 28:8,13
  30:10 37:19 40:17
  40:20
given 12:19 20:25
  24:5 26:8 46:7,18
  52:2 54:4 56:7
go 8:10 11:20 19:22
  20:7,12,18 21:6
  21:16 23:6 30:18
  37:7 39:18,20
  46:8
going 4:12 18:16
  30:10 34:16 37:4
  43:17
Good 18:4
gotten 33:9,10
GRAMLING 2:4
guess 15:12 20:23
  30:3 33:17 37:16
  39:1 52:20

**H**

handover 45:25
happened 5:13 6:4
  6:4
head 21:20,21
  27:18
hearsay 24:10
helm 10:16
help 40:17
heretofore 3:8
hey 31:14 32:5
hired 30:18,23 31:6
  31:13,21 32:4
house 38:25
houses 39:17,18

**I**

IAMI 4:20
idea 12:4 26:17
identified 7:13,17
  10:22 16:18
identify 47:14
identifying 7:8
immediate 12:11
  37:22,23 38:19,20
  38:21
incident 5:7 36:19
include 46:19
individual 7:20
  11:18 22:12 24:6
  34:22 39:11
individuals 6:12
  7:14,17,18 8:3
  16:19,22 17:19
  20:5,13 22:7,7,8
  22:13,13,15,21
  27:5 37:15,17
  45:17 47:21
inform 29:3
informant 24:13,16
  25:8 28:3 30:5,12
  32:11 36:15 37:15
  40:19 46:18 48:21
  51:13
informant's 44:3
information 5:3,11
  5:23 6:11,14 7:9
  7:10 8:3 9:20
  10:4,9,10,18 11:5
  11:14 12:10,18,21
  14:2,4,11 15:9,13
  16:2,4,8,10,17,18
  16:25,25 17:13,22
  19:6,7,15 21:23
  23:7,8,14 24:5,7
  24:18 25:4 26:16
  26:25 27:24 28:1
  28:8,14,17,20
  29:4,8 30:1,6,11
  30:13 34:11,19,23
  35:3,7,12 36:5
  37:19 41:2,2,7,9
  42:19,20,22 43:18
  43:20,22,25 44:2
  44:12,14 45:5,6
  45:25 46:11,15,21
  46:25 47:2,6,11
  48:19 49:7 51:4,7
  51:11,12,16,20,22
  52:2,4
initial 5:15,24 6:2
  15:8 19:7 21:24
  29:12,20,22 52:24
initially 15:23

16:12 26:23 27:23
  46:11
initiated 5:15
instituted 15:16
insurance 1:7 6:22
  15:12,17,20,20
  17:4,5,9 18:9,19
  18:25 19:9 21:8
  23:11 24:22 25:23
  26:12,15 27:1,2,7
  27:9,11 29:2,16
  29:19 37:10 40:16
  41:1,5 43:5,11
  44:15 45:19,24
  49:5 50:16,20,22
  51:2,6 52:3,10,14
  52:19 57:5
intending 9:1
intent 5:25
intention 20:8
interest 16:22 22:7
  22:8,14,16,22
  36:6
interested 56:10
International 4:20
interview 13:8,13
  13:18
interviewing 13:23
investigates 18:19
investigating 12:6
  24:19,21 42:6
investigation 5:16
  5:19,24 6:3,21 7:3
  10:11 11:8,12,23
  12:14,17 15:4,8
  16:14,22 17:17
  18:17 19:8 20:1
  21:24 22:21 23:1
  23:11 27:5,14,17
  27:20 30:8 31:25
  34:20 39:9 41:7
  41:21,24,25 43:1
  44:18,19 51:24
investigations
  39:14
investigator 4:19
  44:19 52:11,15,18
  53:1
investigators 4:21
  15:12
involved 4:13 7:14
  7:18 9:17,22
  14:24 16:20,24
  18:25 19:9 20:3
  21:3 22:10,25
  35:4 36:11,15,16
  39:14 40:21 41:17

44:15 45:19 46:16
  48:9,13
involvement 9:23
issue 6:10 21:16
items 34:9 44:5

**J**

Joe 11:18,22 12:1
  36:2,7,10,11,12
  36:13,15
Johnson 1:23 3:7
  56:3,14 57:16
Jr 37:11,12
judge 44:20,21,22
  44:23
June 5:8 27:24

**K**

Karcher 2:2,2,2,11
  2:12,13 7:7 8:5,20
  9:3 10:17,25 12:9
  14:17 18:3,5
  44:24 47:7,19
  48:1,24 49:17
  50:1 53:10 57:19
keep 32:11 45:16
kept 15:14
Key 5:21 41:13,16
  42:8,12
kind 25:15 40:1
knew 28:21 42:5
  48:21
know 5:23 14:6
  17:18 23:10 24:8
  26:13,14 28:23,24
  29:1,7,23 32:20
  32:23 33:21 36:2
  36:10,13,14 38:9
  38:12 39:23 41:20
  41:23 42:22 43:14
  43:23,24 44:9
  48:14 49:4 52:25
knowledge 9:13,21
  27:3 29:24 35:23
  35:23 36:1 42:24
  43:10 48:18
known 24:7 36:6
  39:20
knows 6:12

**L**

Large 3:8
Lauderdale 1:24
  57:10
Laura 52:16,25
law 4:10 17:6,7
lawful 3:14

lawyer 39:13
lead 19:2 30:16
  44:19 46:1 52:20
  52:22
leading 17:20
leads 28:10,12
learn 5:10,18 10:6
led 33:9
left 12:8 40:8,8
legal 6:24 12:21
level 23:10
liaison 15:21 17:6
liberty 33:11 34:14
  35:2,25 38:17
  43:15 44:7,10
  51:8,21,25
Line 54:6
link 8:16 35:12
little 52:23
living 3:21 14:5
  39:23,24,25
locate 13:8,13
  39:10 40:5
long 4:10 28:11
longer 46:5
look 21:14 50:8
looked 36:11 50:15
  50:19,24
looking 19:23 20:1
  40:13 51:2
loss 16:6 29:4,8
  48:20,22
lot 34:5

**M**

MacKenzie 7:21,24
  7:25 8:18 9:8,18
  9:25 10:7 11:7
  12:8 13:14,19,24
  14:16 16:19 20:6
  20:9,15,20 21:19
  22:3,24 32:20
  39:4,7 40:22,24
  45:14 46:6 48:4
MacKenzie's 14:11
  39:20
making 54:4
manpower 18:20
marine 4:18,21
maritime 39:13
Marked 2:17
matter 29:2 43:20
  45:22 57:8
McGee 23:15,15,16
  23:16,19 53:5,8
mean 8:9 18:15
  22:16 24:2 36:7

42:3 49:16
meaning 24:22
means 16:9 18:16
18:20 46:23
mention 8:12 10:19
29:25 33:12 38:22
mentioned 4:13
6:17 8:14 9:7
20:5,21 26:7
29:23 31:23
messages 40:8
met 45:20
Miami 46:20
Miami-Dade 3:22
4:4 15:17 18:11
18:22 19:15 41:16
42:25 48:15 57:2
Michael 2:2 18:4
57:19
mind 52:17
minutes 18:7 48:12
mistaken 5:9 15:19
42:5
monetary 14:22
money 8:7,8,17
14:25 30:14,19
40:20 46:16 48:8
48:13,15,21
money-driven
30:16
monies 8:22
months 19:12 21:10
27:22 48:6,7
morning 18:4 38:4
38:5,6,7,8
mother 14:5,6,8
40:8
motive 14:20 17:20
motorcycles 4:7
moving 13:24

**N**

N 2:7
name 3:19 4:24 7:1
7:20 11:18,25
18:4 23:2 30:4,11
52:15,16,25
named 12:1 36:10
36:15,15
names 11:22 19:25
20:13
Nancy 1:23 3:6
56:3,14 57:16
National 15:20 27:1
nature 15:10 17:2
33:12
necessary 57:9

necessity 10:15
need 37:1,2 40:17
negative 39:11
Neil 15:3 40:25
never 8:21 14:13
46:16 48:8,13
NICB 17:4,6
Nicholas 4:25 18:5
31:21 50:17,25
51:6
Nick 37:12
NICOLAS 1:4
nodding 21:21
nods 21:20 27:18
normal 39:8,15
Notary 3:7 56:15
notes 25:12,14
notice 3:8 57:7
number 28:24
numbers 16:8 33:21
39:6,17 41:9
N.W 1:16 3:9 57:3

**O**

oath 3:16 25:16
56:1
Object 7:7 8:5,20
9:3 10:17,25
11:20 12:9 14:17
47:7,19 49:17
Objection 48:10
obtain 14:4 16:7,9
16:24 25:24 34:8
obtained 4:18 5:16
5:23 6:14 7:9
10:9,11,18 12:10
13:6 15:9,14
16:10 19:7 26:25
34:12 35:7,9 41:7
41:10 42:21
obviously 9:5 31:24
43:6,8
occur 15:11
occurred 11:3
offer 29:17
offered 29:15 48:15
48:19,21
office 6:16 12:19
13:2,3 19:6,15
20:7 21:5 23:3,5
23:20 24:25 25:20
26:3,21 27:7 28:4
28:7 29:11,15
40:15 43:1,4,7,12
43:17 44:6 45:5
51:23 53:6 54:22
57:10

officer 54:4
officers 41:16,16
Oh 48:10
Okay 5:13 6:17
25:7 32:15 33:13
44:24 48:24
onboard 10:15
ones 19:1
ongoing 16:15
17:10,16 18:8,10
27:14,16,20 30:7
44:17
open 7:2 17:10,16
18:8,10 27:20
opened 5:24
order 6:15 8:10
13:6 21:25
ordered 44:23
organization 4:19
4:20 45:23
organizations 27:4
organized 4:8
original 54:21
originally 27:25
owned 4:25 16:23
owner 9:1 22:24
31:4,6,9,13,15,20
32:4,6 35:12
owners 8:14 9:6
20:3 30:25

**P**

Page 2:9 54:6
paid 8:10,13,25 9:1
9:5,8,10 31:3
32:16,17,20,23,24
33:9,10,14,16,19
33:20 34:3 46:14
paperwork 32:1
part 7:11 19:20
45:15
particular 4:14
12:6 38:3
parties 44:15 54:22
56:9,9
pay 9:2
pending 3:5
people 9:1,2 21:8
49:14
person 7:5,8 12:1,3
32:6 36:6,6 46:24
47:5,14 51:18
52:22
personal 14:23 19:7
49:9
personally 24:7
26:19,20 43:14

56:4
persons 37:15
pertinent 19:21
phone 12:17 39:5
39:17 40:7 44:4
photos 34:8,17
phrase 22:6,15
23:23
physically 6:3
31:25
picking 9:19
pictures 44:4
place 1:16 14:16
Plaintiff 1:5 2:3
planning 44:14
please 3:19 13:22
54:21 57:7,10
point 6:20,23 7:2,4
9:16,21 10:5
11:23 12:23 13:4
15:2 16:1,15
17:11,22 18:22,24
19:23 20:25 21:2
21:23 22:20,20,23
23:7 24:19 30:8
35:2 37:1,6,9,19
38:17 39:4 40:9
43:9,19 44:7,9
45:6 50:24
police 3:22,24 4:4
15:17 18:11,22
41:12 42:9,12
48:15 57:2
possession 44:5
possibility 24:14
possible 5:12 23:3
24:13,15,17 27:24
possibly 22:25
powerful 49:14
present 6:15 19:18
31:18
presented 19:14
20:24 23:2
presenting 20:14,18
pretty 16:8 17:23
18:12 19:5 31:9
41:8 42:18 47:2
previous 22:11
prior 10:6 27:19
29:10 51:3
privileged 24:18
privy 37:19
probable 37:7
probably 19:13
procedure 45:23
54:1
process 19:17

professional 5:1
proof 31:16
protocol 45:22
prove 7:11 10:2
31:25
provide 8:2 16:16
PROVIDES 54:1
providing 47:6
public 3:7 14:13
16:9 41:11 44:12
56:15
purpose 3:3
pursuant 3:8
put 6:15 12:18
34:25

**Q**

question 5:12 13:21
50:18
questions 18:6 36:3
44:25 48:2,25
52:6,7 53:11

**R**

R 2:2,4 57:19,19
read 57:11
ready 57:9
really 11:21 14:9
41:8
reason 17:12 26:5
30:7 40:21 49:20
54:6
reasons 14:22 54:4
recall 11:21 19:11
21:9 31:8 32:8,9
36:17 38:7 39:2
40:23 42:14,16
45:10 48:5
receipts 44:5
receive 27:25 35:12
received 5:11 6:11
23:8 27:23 30:13
42:23 47:12
record 30:4,9 56:6
records 6:14 12:17
12:18 14:13 33:3
33:3,8 41:11 44:4
Recross 2:12,13
49:25
RECROSS-EXA...
47:24
Redirect 2:12,13
45:1 49:1
reference 14:23
referring 30:20
32:17
regard 13:11,16

36:25 41:21 42:1
  42:25 43:4,13
  44:2,13 50:11,16
  50:21 51:5,14,17
**regarding** 4:7,23
  5:11 23:20 27:5
  28:16 33:1 34:18
  37:17 48:19 49:3
  51:18 52:6
**registered** 14:12
**reiterated** 14:21
**relationship** 11:6,7
  11:12
**relative** 56:8,9
**reliable** 7:6,12
**remain** 49:21
**remember** 9:4
  11:23,25 31:10
**reopen** 43:8
**repeat** 13:21 50:18
**report** 41:12,13
  42:1,18 56:6
**reported** 5:20
**Reporting** 1:23
  57:10,16
**reports** 5:16
**request** 46:2,7
**requests** 40:16
**require** 43:11
**required** 10:23
**respect** 4:15 5:4
  9:24 11:19 16:2
  49:5
**rest** 21:2
**result** 33:7
**resulted** 39:11
**Retribution** 49:19
**revenge** 14:24
**reviewed** 20:23
**reward** 28:17,21,23
  28:25 29:3,7,13
  29:14,15,17 30:2
  48:19 49:3,6
**right** 6:9 19:5,8
  20:12 21:4 24:18
  31:8 39:2 41:6
  51:7
**rule** 22:18 54:1
**RULES** 54:1

**S**

**S** 1:23 3:6 56:3,14
  57:16
**safety** 47:22 49:9
**saying** 9:4 15:22
  32:5,11 38:20
  48:11

**says** 28:13
**scenario** 11:19
**scuttle** 6:13 8:11
  9:2 30:19 31:7,22
  51:19
**scuttled** 6:6 16:7
  17:19
**scuttling** 7:15,19
  8:18 9:9 12:2
  16:20 17:20 35:5
**seat** 19:1,3 45:21
**see** 15:10 27:13
  48:11
**seen** 12:7
**sense** 9:5 31:4,8,12
  31:14,24 32:6
**separate** 41:24 42:3
**seven** 4:17 38:5
**sheet** 54:1,21
**show** 19:21
**showed** 33:8
**sign** 57:9,11
**signature** 55:1 57:8
**signed** 54:21
**sink** 8:4 31:13
**sir** 3:19
**sit** 25:14
**sitting** 26:11
**six** 9:10 33:14,23
  34:5
**somewhat** 10:12
  11:16 13:5 24:25
  25:4
**sons** 17:1 22:12
  36:9
**sorry** 13:22 35:7
  48:11
**sort** 50:3
**sounds** 29:5
**source** 6:11,17,19
  6:20,23 7:1,5,13
  7:18 8:2,12,14,16
  8:17,24,25 9:12
  9:13,15,17 10:10
  10:23 11:15 14:15
  14:19 15:10 16:11
  16:18 24:6 28:2
  45:9 46:10,11
  47:6,11,11,13
  48:11,13 49:4,8
  49:20 50:2
**Southern** 1:1 3:6
**speak** 11:10 40:13
  41:15 42:11
**speaking** 12:20
**Special** 15:3
**specialization** 4:15

**specialize** 4:6
**specialized** 4:2
**specializing** 4:17
**specialty** 4:4
**specific** 17:13 19:25
  23:13 47:2 52:11
**specifically** 20:17
  31:5 32:9 50:5
  52:9
**specify** 34:13
**spoke** 6:24 19:5
  42:14
**spoken** 40:9
**Sr** 36:18,22
**Sr's** 38:25
**stages** 6:2
**Star** 4:24 5:7 6:10
  8:4,15 10:7 14:16
  16:2
**start** 31:19 38:21
**started** 21:3
**state** 3:7,19 6:16
  12:19 13:1,3 19:6
  19:15 20:7 21:5
  21:14 23:3,5,13
  23:20,24 24:25
  25:20 26:3 27:6
  33:12 37:4,6
  40:15 43:1,4,7,12
  43:17 44:6 45:4
  51:5,23 53:5 56:2
  56:15,15
**statement** 13:5 15:9
  25:6,7,8,11,15,16
  25:17,18,19,22,25
  26:3,8,10 29:20
  29:22 31:10 33:19
  34:10,24 35:9,15
  38:1 40:23 50:13
  54:4
**statements** 7:12
  34:18,22 44:4
  45:9 46:17 51:17
**States** 1:1 3:5
**status** 16:13 17:9
  23:10
**stenographically**
  56:6
**steps** 39:6 40:5
**stopped** 51:2
**Straight** 30:18
**Street** 1:16 3:9
**strictly** 14:21 18:18
  22:23
**submitted** 13:4
**subpoena** 33:3,8
**subpoenaed** 12:17

33:2
**subpoenas** 34:12,24
  34:25 35:8 41:11
**substance** 42:16
  54:2
**successful** 13:11,16
**Suite** 57:3
**Sullivan** 15:3,23,24
  15:25 16:5,13,16
  17:1 37:16 41:1,3
**summary** 19:19
**sunk** 6:6
**superiors** 26:22
**supplements** 42:20
**supposed** 8:17
  38:10
**sure** 12:5 36:4,10
  36:12 50:19
**suspect** 22:19 23:1
  23:3 24:11,15
  33:9
**suspected** 38:13
**suspects** 20:4 22:22
  24:13,17
**sworn** 3:15 25:16
  25:18,19,22,25
  26:2 56:4
**S.E** 1:24 57:10

**T**

**take** 13:2 19:3
  20:22 25:15 30:24
  31:6 40:5 46:1
  50:7 57:7
**taken** 1:14,15,22
  3:2 26:15 43:3
  50:11
**takeover** 52:24
**takes** 45:24
**talk** 14:5 36:18,21
  36:24,24 37:2,11
  37:16,17 39:18
**talking** 32:18,19
  36:12,13 37:23
  38:20,22 43:24
  44:22
**taped** 25:16
**Task** 4:2
**technical** 19:20
**tell** 8:25 16:13
  19:17 21:5 22:16
  24:1 28:6,20
  30:15 33:22,24
  34:15,25 35:3,23
  37:22 38:15 43:21
  49:9 50:2 51:25
**telling** 10:3 51:11

**testified** 3:16 47:4
**testimony** 43:16
  56:7
**Thank** 17:25 44:1
  44:24 47:23 48:24
  49:23 53:10,13
**theft** 5:12 41:13,17
  41:21 42:1
**thefts** 4:8
**thing** 40:4,6
**things** 15:10 17:1
  39:15
**think** 5:22 33:6
  38:23 42:5
**Third** 57:10
**thought** 38:15,18
  49:14
**three** 38:6
**time** 1:16 5:10
  10:23 11:16 12:8
  12:15 13:22 15:2
  16:1 27:20 31:5
  31:12 34:2 36:3
  38:3 42:11 44:25
  45:7 48:3 51:25
  45:7 48:3 51:25
  46 51:12
**turned** 23:21 25:19
  45:7 48:3 51:25
**turn** 26:2 44:6 51:4
  51:12
**turned** 23:21 25:19

25:22 26:16 27:6
37:20 43:2 51:1,3
51:16,23
**turning** 44:14
**two** 8:3 40:21
**type** 10:2 12:7
28:10,17 47:20

_____
**U**
**unable** 45:7
**unbias** 24:6
**undersigned** 56:3
**understand** 12:20
**understanding** 6:18
17:8 21:13 24:24
41:12
**undertook** 14:20
**Unfortunately**
11:21
**unit** 4:2,5 5:3 7:3
15:4
**United** 1:1,23 3:5
57:9,16
**unknowing** 9:24
**use** 3:4 18:16 22:15

_____
**V**
**v** 57:5
**vehicle** 12:11,12,13
37:21,24 38:1,9
38:12,16
**vehicles** 4:7
**Verbal** 25:9
**verify** 15:7 41:1,2
**vessel** 4:23 5:4,12
5:14,20 6:5,13
7:15 8:11,15
10:12,13,20 16:7
16:24 22:13,25
28:22 29:4,8,13
30:25 31:13 32:4
35:13 37:25 38:23
39:1 42:1 47:20
48:20,22
**vessels** 4:16,17
**view** 18:22
**volunteered** 46:11
**voracity** 50:12
**vs** 1:6

_____
**W**
**waive** 57:8
**want** 28:13
**wanted** 15:7,10
28:8 30:9 45:16
49:20
**warrant** 21:16 40:1

**wasn't** 8:21 21:15
37:7
**way** 23:6 34:15
36:8 39:12 46:9
47:9 51:9
**week** 48:6
**weeks** 19:12 21:10
**went** 4:18 5:23
14:12 39:9 40:6,6
41:10 45:4
**weren't** 36:4
**We're** 4:23
**whereabouts** 14:3
14:11
**William** 23:15,16
53:8
**Winch** 1:10 2:10
3:1,13,20 45:3
57:2,6
**witness** 1:22 2:9
21:20 22:18 27:18
54:3,4 55:1 56:4,7
**witnessed** 31:18
32:1
**woman** 32:12,13
**woman's** 50:13
**work** 4:1 41:15
**working** 52:10,12
**works** 19:17
**worldwide** 4:22
**world-wide** 4:20
**wouldn't** 43:15,21
**write** 21:22 54:5
**written** 25:8,11,15
34:10,17
**wrote** 25:12

_____
**X**
**X** 2:7

_____
**Y**
**Yeah** 39:22
**year** 19:12,13 21:11
21:12 48:6,7
**years** 4:12,17
**yesterday** 17:15
27:12

_____
**$**
**$50,000** 29:3,19
48:18

_____
**1**
**1st** 5:22
**1.310** 54:1
**10-CV-20938-JLK**
1:2

**10:50** 53:15
**100** 57:3
**1218** 1:24 57:10
**13** 1:15
**13th** 3:10
**16** 4:12
**1701** 57:3
**18** 2:11
**18th** 56:11

_____
**2**
**2009** 5:8 27:24
**2011** 1:15 3:10
56:11
**25th** 1:16 3:9
**28th** 5:21

_____
**3**
**3** 2:11
**3rd** 1:24
**33172** 57:4
**33316** 1:24

_____
**4**
**4-13-11** 57:7
**4-18-11** 57:1
**4/2/2014** 56:16
**45** 2:12
**47** 2:12
**49** 2:13,13

_____
**5**
**525-2221** 57:10

_____
**6**
**6:00** 17:15 27:12

_____
**8**
**85** 4:24
**87th** 57:3

_____
**9**
**9:50** 1:16 3:11
**9105** 1:16 3:9
**954** 57:10